David R. Fox*
Joshua Abbuhl*
Qizhou Ge*
Max C. Accardi*
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 948-1135
*dfox@elias.law*
*jabbuhl@elias.law*
*age@elias.law*
*maccardi@elias.law*

**Pro Hac Vice* Applications Forthcoming

Thomas P. Amodio
Kevin M. Boots
Lily Ginsburg
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
(907) 222-7100
(907) 222-7199 (facsimile)
*tom@reevesamodio.com*
*kevin@reevesamodio.com*
*lginsburg@reevesamodio.com*

Attorneys for Proposed Intervenors
Alaskans for Mary and DSCC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF ALASKA; CAROL BEECHER, in her official capacity as Director of the Division of Elections of the State of Alaska; the ELECTION BOARDS of the STATE OF ALASKA; and the BALLOT COUNTING REVIEW BOARDS of the STATE OF ALASKA,

Defendants.

Case No. 3:26-cv-00376-SLG

**ALASKANS FOR MARY AND DSCC'S PROPOSED MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ........................................................................................................ 7

I. The NVRA provides no legal basis for DOJ's claim. ........................................ 7

II. DOJ has no other legal authority to interfere with Alaska's election. ........................ 14

III. DOJ does not allege facts plausibly showing voter confusion. ........................ 16

IV. DOJ seeks impossible and unlawful relief. ........................................ 19

V. *Purcell* separately bars DOJ's requested relief. ........................................ 23

CONCLUSION ........................................................................................................ 25

## INTRODUCTION

This case never should have been filed. The Department of Justice ("DOJ") seeks to enjoin certification of Alaska's U.S. Senate election if the President's preferred candidate loses, based on a federal statute that regulates only voter registration and has literally nothing to say about which candidates are listed on a State's ballot or how the candidates' names are displayed. DOJ does so despite lacking any statutory or constitutional authority to insert itself into a domain—federal elections—that the Constitution leaves exclusively to the States and to Congress, not the Executive Branch. DOJ also does not allege any factual basis for its claims, but merely assumes without evidence that everyone who votes for Daniel J. Sullivan really meant to support Senator Dan S. Sullivan, even though Alaska's ballots clearly differentiate between the two candidates. And on that non-existent reed, DOJ seeks to enjoin certification if there is a narrow victory by Mary Peltola, so that DOJ can interrogate voters who say they voted for Mr. Sullivan about whether they perhaps meant to vote for the President's endorsee, Senator Sullivan, instead.

DOJ's claim is lawless and utterly unsupported by precedent or statute. The issues it raises are governed by Alaska law and were definitively resolved by the Alaska Supreme Court in June. The U.S. Supreme Court, the Ninth Circuit, and every other court to consider the issue have rejected Executive Branch efforts to seize on out-of-context snippets from federal statutes' statements of purpose to impose federal law duties without any basis in a statute's operative text. *E.g.*, *Nebraska v. Su*, 121 F.4th 1, 4–5 (9th Cir. 2024). And DOJ

has no authority to sue in this domain in the absence of a statute authorizing it. *United States v. Mattson*, 600 F.2d 1295, 1300–01 (9th Cir. 1979).

DOJ does not even have a coherent factual theory. It assumes that every Alaska voter who casts a vote for Daniel J. Sullivan really meant to vote for Senator Sullivan, but that assumption is insulting to voters and irreconcilable with Alaska's ranked-choice voting procedures and the ballot's clear differentiation between the two candidates. DOJ does not allege any facts plausibly showing actual voter confusion, much less ones that could possibly warrant the sweeping and unprecedented investigation into voters' motivations that the Complaint demands.

Nor is that remedy lawful, or even possible. DOJ proposes a sweeping and unprecedented post-election investigation into the private motives of every voter who says they cast a ballot for Daniel J. Sullivan. It has provided no authority suggesting that such an investigation is legal. Nor has it explained how such an investigation could even be conducted, particularly considering the secret ballot and the fact that any voter who was actually confused will not, by definition, know that they voted for Mr. Sullivan rather than Senator Sullivan. Such an investigation raises an obvious and enormous danger that voters will retroactively claim confusion and seek to change their votes, under pressure from government investigators ordered to produce the President's preferred outcome. Such an investigation would also violate Alaskans' bedrock rights, including the right to cast secret ballots, the right to cast ballots that will not be retroactively invalidated, and the right to be treated equally to other voters.

DOJ's inexcusable delay in bringing this case is also an independent reason to deny its request for equitable relief: the inclusion of Daniel J. Sullivan on the ballot was decided in June, and his inclusion on the general election ballot was finalized in August, yet DOJ waited until the eve of the election to bring this case.

In short, DOJ's Complaint is wholly baseless. The fact that DOJ nonetheless chose to file it raises profound constitutional concerns. The Court should dismiss the Complaint.

## BACKGROUND

Mary Peltola declared her candidacy for the U.S. Senate seat currently held by Senator Dan S. Sullivan on January 12, 2026. On the same day, she launched her campaign committee, Alaskans for Mary. In the August 18, 2026, primary election, Peltola received 49.5% of the vote, more than any other candidate. She advanced to the general election along with three other candidates.

One of Peltola's three opponents in the general election is Daniel S. Sullivan, the incumbent junior U.S. Senator from Alaska. ECF No. 1 ("Compl.") ¶ 1. Senator Sullivan is a member of the Republican Party. *Id.* Earlier this year, the Alaska Republican Party complained to the Alaska Division of Elections about the candidacy of another of Peltola's opponents, Daniel J. Sullivan ("Mr. Sullivan"), asserting that voters might confuse Mr. Sullivan with Senator Sullivan. *Id.* ¶ 22. The Division of Elections excluded Mr. Sullivan's name from the primary election ballot based on a determination that he was not a good-faith candidate. *Id.* ¶ 23. But Mr. Sullivan successfully challenged the Division's decision to remove him from the primary ballot in state court. *Id.* ¶ 24. On June 26, 2026, a superior

court judge ordered the Division of Elections to include Mr. Sullivan's name on the primary ballot. *Id.* ¶ 24; Order on Administrative Appeal, *Sullivan v. Alaska Div. of Elections*, No. 3AN-26-07485CI (Alaska Super. Ct. June 26, 2026).[1] Three days later, the Alaska Supreme Court affirmed. Order, *Alaska Div. of Elections v. Sullivan*, No. S-19935 (Alaska June 29, 2026).[2] The Alaska Supreme Court remanded the matter to the Division of Elections and directed it to decide how to list Mr. Sullivan as a candidate in accordance with Alaska ballot design law. *Id.*

On June 29, 2026, the Division of Elections released the sample ballot for the 2026 primary. To ensure that voters could distinguish Mr. Sullivan from Senator Sullivan, it used the candidates' different middle initials, listed Mr. Sullivan with no party designation, and added "Incumbent" next to Senator Sullivan's listing.[3] No one—from DOJ or otherwise—sued to challenge this approach. The primary occurred on August 18, and on August 31, the Division of Elections certified the results of the primary and finalized the general election ballot design with the top four candidates advancing to the general election. Compl. ¶ 32. The general election ballot listings for Senator Sullivan and Mr. Sullivan mirror the primary election ballot design, including both candidates' middle initials,

---

[1] Available at https://perma.cc/WY72-2DK7. The Court can take judicial notice of these judicial opinions and the other matters of public record cited below when evaluating Proposed Intervenors' Motion to Dismiss. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

[2] Available at https://perma.cc/UFR5-GTJF.

[3] *See Sample Ballot 2026 Primary*, Div. of Elections, State of Alaska, https://perma.cc/3UBW-7FEB (last visited Oct. 25, 2026).

indicating Senator Sullivan's status as "Incumbent," and listing Mr. Sullivan without a party designation. *Id.* ¶ 32.

| United States Senator | | | | | |
|---|---|---|---|---|---|
| | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
| **Heikes, Gerald L.** (Registered Republican) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Peltola, Mary** (Registered Democrat) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Sullivan, Daniel J. Jr.** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Sullivan, Dan S.** (Registered Republican) Incumbent | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Write-in:** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |

[4]

Once again, no one—from DOJ or otherwise—challenged this ballot listing or the Division's decision to list these four candidates on the general election ballot. The ballots were therefore printed in that format.

Alaska's 2026 senatorial election is already well underway, using the ballots approved by the Division of Elections. Absentee ballots were mailed on October 9, and in-person early voting began on October 19.[5] After election day, Alaska law tasks Election Boards with counting ballots for their respective precincts, after which they must certify the results to the State Ballot Counting Review Board. AS §§ 15.15.360-370. The State Ballot Counting Review Board must then review the certificates and "certify the person receiving the largest number of votes for the office for which that person was nominated or elected." *Id.* § 15.15.450.

---

[4] Compl. at 10.

[5] *Absentee and Early Voting*, Div. of Elections, State of Alaska, https://perma.cc/U6CD-KCSY (last visited Oct. 25, 2026); James Brooks, *Thousands of Alaskans are Voting Before Election Day. Some ballots Won't Be Counted Until After It*, Alaska Beacon (Oct. 22, 2026), https://perma.cc/RXZ4-SXHJ.

On October 22, DOJ filed this case against the State of Alaska, the Director of the Division of Elections of the State of Alaska, the Election Boards, and the State Ballot Counting Review Board (collectively "Defendants" or "Alaska"), seeking to interrupt the State's normal ballot-certification process. Specifically, DOJ asks the Court to prohibit Defendants from certifying the results of the U.S. Senate election, if "(1) Senator Sullivan does not win the election; and (2) had all votes cast for Daniel J. Sullivan been cast instead for Senator Sullivan and Alaska's rank-choice process played out accordingly, Senator Sullivan would have won the election." Compl. ¶ 42. DOJ then demands an unspecified "investigation to determine whether votes cast for Daniel J. Sullivan were meant to be cast for Senator Sullivan and any further procedures or relief this Court deems necessary and appropriate to determine what the result would have been absent Daniel J. Sullivan's inclusion on the ballot." *Id.* ¶ 44.

## LEGAL STANDARD

DOJ's Complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (holding dismissal required "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory"). Courts "accept as true all of the allegations contained in a complaint" but need not accept conclusory assertions or "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," *id.*, or mere "labels and conclusions," are insufficient, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

### I. The NVRA provides no legal basis for DOJ's claim.

DOJ's only claim is under the National Voter Registration Act ("NVRA"), but the NVRA has nothing to say about the candidate qualification, ballot design, and election certification issues that DOJ seeks to litigate. The NVRA regulates voter registration and serves "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). Nothing in the NVRA regulates which candidates are listed on ballots or how they are displayed. *See* 52 U.S.C. § 20501, *et seq.* Nor does the statute say anything about certifying elections. *See id.* That is why DOJ does not cite, anywhere in its Complaint, any of the actual legal duties that the NVRA imposes on States, all of which relate entirely to voter registration. *See id.* §§ 20503–20507, 20509.

Instead, DOJ relies exclusively on an out-of-context snippet from the NVRA's declaration of purpose, which states that Congress enacted the NVRA in part "to protect the integrity of the electoral process." Compl. ¶¶ 3, 43 (quoting 52 U.S.C. § 20501(b)(3)). DOJ contends that this language imposes a generalized "duty" on States, *id*. ¶ 3 (quotation omitted), to protect election integrity and empowers DOJ with sweeping authority allowing it to sue under the NVRA's civil enforcement clause whenever DOJ would prefer that a State conduct its elections differently. *See id.* ¶¶ 10, 16 (citing 52 U.S.C. § 20510(a)). In other words, DOJ finds a heretofore unrealized power that would allow the Executive

Branch to dictate how states run their elections—and state supreme court decisions on questions of state law—based on DOJ's subjective view of fairness.

This is all nonsense. The election integrity language from the NVRA's declaration of purpose provides no basis for a lawsuit disconnected from the NVRA's actual requirements. Courts uniformly hold that statutory statements of purpose, unlike operative provisions, do not impose legal duties. "A statutory statement of purpose provides *no legal authority*." *Kentucky v. Biden*, 57 F.4th 545, 551 (6th Cir. 2023) (emphasis added). And "statements of purpose . . . by their nature 'cannot override [a statute's] operative language.'" *Sturgeon v. Frost*, 587 U.S. 28, 57 (2019) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 220 (2012)) (alteration in original). They might, at most, "resolve an ambiguity" in a different "operative clause" of the statute, but "apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause." *District of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008). DOJ's reliance on a snippet from the NVRA's statement of purpose is therefore a "search[] for power in a powerless provision." *Kentucky*, 57 F.4th at 551. When asked in *Kentucky* to "provide examples . . . of a court countenancing an agency's attempt to carry out a purpose provision, in addition to its operative provisions, *the government could not provide a single one*," other than the statute at issue. *Kentucky*, 57 F.4th at 552 (emphasis added).[6]

[6] *See also, e.g.*, *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) (a statutory preamble "cannot enlarge or confer powers"); *El Comité Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008) ("Unlike the statute's operative part, the preamble does not prescribe rights and duties . . . , nor does it enlarge or confer powers

DOJ should know better. Just two years ago, the Ninth Circuit specifically rejected an argument (made by DOJ) like the one it makes here. In *Nebraska v. Su*, the Ninth Circuit considered a challenge brought by several states against a Department of Labor regulation that required federal contractors to pay a minimum wage, which the states argued lacked statutory authority. 121 F.4th at 4–5. DOJ argued that the rule was authorized by two provisions of the Federal Property and Administrative Services Act, one of which was a purpose clause stating that "[t]he purpose of this subtitle" was to provide the government with an "economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting," and the other of which authorized the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle." *Id.* at 7 (quoting 40 U.S.C. §§ 101, 121). Similar to here, DOJ argued that those two provisions when "read together" provided "the President with broad authority to implement any policy he 'considers necessary' to carrying out the [statute] so long as the policy bears some nexus to the statutory goals." *Id.*

The Ninth Circuit rebuffed that contention. It squarely rejected the idea that an agency could derive its power to act from a statute's generic "purpose statement," and

---

on administrative agencies or officers." (citation modified)); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1298 (11th Cir. 2022) ("[A]n expansive purpose in the preamble cannot add to the specific dispositions of the operative text." (quotation omitted)); *Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022) ("But statements of purpose are not *themselves* those operative provisions, so they cannot confer freestanding powers upon the President unbacked by operative language elsewhere in the statute."); *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 480 n.3 (7th Cir. 2016) ("We're not suggesting . . . that a legislative statement of purpose provides statutory meaning independent of the operative statutory text."), *aff'd*, 583 U.S. 202 (2018).

instead required that any agency action be based on one of the statute's "operative provision[s]." *Id.* at 8; *see also id.* at 11 ("[W]e conclude that § 101 [the purpose section] is not a source of . . . authority. We must find that authority, if it exists, in other operative sections."). Thus, the fact that a different section of the statute authorized the President to "prescribe policies" he considers "necessary to carry out this subtitle" (much like § 20510(a) of the NVRA authorizes DOJ to "bring a civil action" "as is necessary to carry out this chapter") did not allow the President to do whatever he thought would serve the statutory purpose, disconnected from what the operative provisions actually said. As the Ninth Circuit explained, the government "cannot 'carry out this subtitle' by 'exerting a power the subtitle never actually confers.'" *Id.* at 7 (citation omitted).

So too here. The Attorney General's authority to sue "for such declaratory or injunctive relief as is necessary to carry out" the NVRA, 52 U.S.C. § 20510(a), is authority to sue to enforce the NVRA's operative provisions. DOJ cannot use it to enforce duties entirely disconnected from voter registration that the NVRA "never actually" imposes, merely because DOJ thinks injunctive relief might improve election integrity. *Su*, 121 F.4th at 8 (citation omitted).

DOJ's argument here is especially weak given the lack of any relationship between the operative provisions of the NVRA and what DOJ views as Alaska's misconduct in allowing Mr. Sullivan to appear on the ballot alongside Senator Sullivan. *See* Compl. ¶¶ 32–33, 41–42. The NVRA says *absolutely nothing* about which electoral candidates may appear on a State's ballots or how they should be listed. It regulates only voter

registration. It was enacted to ensure that "simple means are available to register for federal elections and [that these] means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). To that end, the NVRA's core provisions require states to offer voter registration when individuals apply for a driver's license (52 U.S.C. § 20504), provide for voter registration through the mail (*id.* § 20505), and require States to offer voter registration at certain public agencies (*id.* § 20506). In addition, the NVRA requires States to take steps to ensure their voter rolls are reasonably up to date, namely by requiring States to "conduct a general program" that "makes a reasonable effort" to remove persons from voter rolls because they are ineligible because of either (1) their death or (2) a change in their residence. *See id.* § 20507.

Those operative provisions represent how Congress chose to effectuate the NVRA's statutory purposes, which include "increas[ing] the number of eligible citizens who register to vote," as well as "protect[ing] the integrity of the electoral process," among others. *Id.* § 20501(b); *see Kentucky*, 57 F.4th at 552 (recognizing that a statute's "operative provisions" demonstrate how "Congress chose the means by which to pursue the ends declared in § 101 [a statutory purpose section]," and "declin[ing] the government's invitation . . . to ignore the limits inherent" in those operative provisions "in favor of an 'anything-goes' pursuit of a broad statutory purpose"). After all, "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam).

DOJ's theory in this case would disregard Congress's choices and grant DOJ the previously "unheralded" power, *West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022), to become a roving federal supervisor of elections, free to demand whatever processes it thinks would best promote election integrity no matter what Congress or State law has to say on the matter, all based on a snippet from the "purpose" section of a voter registration law. The major questions doctrine cannot possibly countenance that approach. Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (quotations omitted); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not . . . hide elephants in mouseholes"). And "[i]f ever there were a 'subtle device' for conferring vast regulatory power, a general statement of purpose surely fits the bill." *Kentucky*, 57 F.4th at 552 (citation omitted).

If DOJ had the authority it now claims under the NVRA, it would have used it before now. Most obviously, it surely would have been used in the aftermath of the 2000 presidential election in Florida, where poor ballot design caused thousands of voters in heavily Democratic Palm Beach to mistakenly cast votes for Pat Buchanan when they almost certainly meant to vote for Vice President Gore.[7] Under DOJ's theory in this case, then-Attorney General Janet Reno could have changed the results of that election if she had only thought to sue under the NVRA to enjoin certification while she conducted a post-

---

[7] *See* Jonathan N. Wand et al., *The Butterfly Did It: The Aberrant Vote for Buchanan in Palm Beach County, Florida*, 95 Am. Pol. Sci Rev. 793 (Dec. 2001), available at https://www.jsekhon.com/papers/butterfly.pdf.

election investigation into voters' true intent. But she did not bring that case, presumably because everyone knew she had no legal authority to do so and that such an effort would be extraordinarily improper. Instead, the issue was raised by voters, and rejected, in Florida's state courts where it belonged. *See Fladell v. Palm Beach Cnty. Canvassing Bd.*, 772 So.2d 1240, 1242 (Fla. 2000) (holding that "a court should not void an election for ballot form defects unless such defects cause the ballot to be in substantial noncompliance with the statutory election requirements").

Finally, the small selection of ballot-access cases cited in the Complaint do not help DOJ. None of those cases was brought by DOJ, and none involved the NVRA, so none suggests that DOJ has a cause of action here. And none of the cases says anything to suggest that federal law *requires* States to exclude candidates from the ballot. Rather, each merely recognized that States *may* choose to impose reasonable requirements for candidates to qualify for the ballot, as long as the restrictions are not too burdensome. *See Bullock v. Carter*, 405 U.S. 134, 145–46 (1972); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *Lindsay v. Bowen*, 750 F.3d 1061, 1063–65 (9th Cir. 2014). At most—and it is far from clear this is so—those cases suggest that Alaska *could* have enacted ballot-access laws that would have affected Mr. Sullivan, as long as those laws did not inappropriately abridge his First Amendment rights. Nothing in the cited cases suggests that federal law in general—much less the NVRA—*required* Alaska to include provisions disqualifying Mr. Sullivan, nor that DOJ can sue to enjoin certification of an election victory for Peltola on that basis.

## II. DOJ has no other legal authority to interfere with Alaska's election.

Without a claim under the NVRA or any other federal statute, DOJ has no authority to bring this case. The Executive Branch has no constitutional authority over federal elections: the "Times, Places and Manner" of such elections are "prescribed in each State by the Legislature thereof," while "Congress"—and *only* Congress—"may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. Congress's authority over elections extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). "The President"—and the Executive Branch he leads—"does not feature at all." *LULAC v. Exec. Off. of President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025). "Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds. . . ." *Id.*

All federal power over elections therefore lies with Congress, not the President and the Executive Branch. And Congress has never regulated State ballot access or design rules and has never authorized DOJ to sue to challenge States' choices in this area. Agencies like DOJ have "literally [ ] no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Just as any potential abuse of the judiciary must be curbed, any attempt by the executive branch to encroach in an area properly reserved for Congress 'must be scrutinized with caution, for what is at stake is the

equilibrium established by our constitutional system.'" *Mattson*, 600 F.2d at 1301 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1958)).

Even if DOJ were to invoke voters' constitutional rights—which the Complaint does not do and would have no basis to do—DOJ still would not be able to bring this case. Congress has "den[ied] the federal government broad authority to initiate an action whenever a civil rights violation is alleged," out of a fear that to do so would "inject[] Federal executive authority into some areas which are not its legitimate concern and vest[] the Attorney General with broad discretion in matters of great political and social concern." *Id.* at 1300–01 (quoting H.R. Rep. No. 914, 88th Cong., 2d Sess., Reprinted in (1964) U.S. Code Cong. & Admin. News, pp. 2391, 2450). This case well illustrates the wisdom of that choice.

The two cases the Complaint cites in support of standing do not suggest otherwise. *See* Compl. ¶ 16. *Vermont Agency of Natural Resources v. Stevens* involved a *qui tam* suit, in which the United States had suffered a "proprietary injury resulting from the alleged fraud." 529 U.S. 765, 771 (2000). It also observed that the violation of federal law constituted a sovereign injury "which suffices to support a *criminal* lawsuit by the Government." *Id.* (emphasis added). Neither factor is present here. And *United States v. Raines* did not discuss standing, and involved an expressly authorized lawsuit to civilly enforce a civil rights law enacted pursuant to Congress's authority to "enforce, by appropriate legislation," the protections of the Fourteenth Amendment. 362 U.S. 17, 19–

20 (1960); U.S. Const. amend. XIV, § 5. As already explained, no similar statute authorizes DOJ's claim here.

## III. DOJ does not allege facts plausibly showing voter confusion.

Given DOJ's utter lack of a legal claim or of any legal authority to bring this case, the factual allegations are rather beside the point. But the Complaint fails factually, too. Its theory is that voters will be confused between Mr. Sullivan and Senator Sullivan and will mistakenly vote for Mr. Sullivan when they mean to vote for Senator Sullivan. But to survive dismissal, a complaint must contain facts to "state a claim to relief that is plausible on its face," which demands more than a "sheer possibility." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). DOJ does not allege any facts that would render this concern plausible rather than merely possible, particularly given a ballot design that identifies Senator Sullivan as the incumbent, lists Mr. Sullivan without any party affiliation, and uses both candidates' middle initials, which are different.

DOJ's factual allegations rely almost exclusively on the June 15 letter from the Division of Elections finding that Mr. Sullivan was not a good-faith candidate and that Alaska voters may confuse him with Senator Sullivan. But the concerns raised by the Division's letter predate and were addressed by the Division's ballot design choices, adopted on remand from the Alaska Supreme Court. The Division feared confusion because (1) Mr. Sullivan requested that his name appear on the ballot as "Dan Sullivan"; (2) Mr. Sullivan requested that his affiliation with the Republican Party be designated on the ballot; (3) Mr. Sullivan allegedly worked with a political consultant who has supported

Democrats and has himself voted for Democrats in the past; and (4) Mr. Sullivan's campaign website looks similar to Senator Sullivan's campaign website. Compl. ¶¶ 21–23.

Whatever the merit of those concerns at the time, they have been addressed by the Division's subsequent actions. As the sample ballot image included in the Complaint shows, Mr. Sullivan is *not* listed as "Dan Sullivan" and he is not listed as a Republican—he is listed as "Sullivan, Daniel J. Jr." without any partisan indication. And the Division even added an "Incumbent" designation next to Senator Sullivan's name, to make clear to voters that he, and not Mr. Sullivan, is the sitting Senator:

| United States Senator | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| **Heikes, Gerald L.** (Registered Republican) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Peltola, Mary** (Registered Democrat) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Sullivan, Daniel J. Jr.** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Sullivan, Dan S.** (Registered Republican) Incumbent | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Write-in:** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |

[8]

The Division's two ballot-related concerns have thus been addressed by a ballot design that makes it very easy for voters to differentiate between Senator Sullivan and Mr. Sullivan and leaves no room for confusion between the two candidates. A supporter of Senator Sullivan can easily identify the *only Republican* Dan Sullivan listed on the ballot and also the *only incumbent* identified on the ballot. Senator Sullivan himself recently agreed that "Alaskans can tell the difference between" the two candidates.[9] And just to be

[8] Compl. at 10.

[9] Mariah Timms, Louise Radnofsky, and Lindsay Wise, *Trump Says He Directed Justice Department to Sue Alaska Over Senate Race*, WALL ST. J. (Oct. 23, 2026),

sure, Senator Sullivan and the Republican Party have blanketed the radio waves with a jingle urging voters to "Put Dan S. Sullivan, in that number one spot."[10] Even if a supporter of Senator Sullivan is still somehow confused, Alaska's ranked-choice voting system allows that voter to ensure their vote will ultimately be counted for Senator Sullivan, simply by ranking both Senator Sullivan and Mr. Sullivan ahead of (or instead of) Peltola. In fact, that is just what Senator Sullivan's jingle encourages voters to do—rank Dan S. first, Daniel second, "Gerry" (another Republican candidate) third, and "just don't rank Mary!" at all.[11] DOJ provides no factual allegations—none—to suggest that Alaska voters are incapable of understanding this quite clear scenario. For any voters who still vote for Mr. Sullivan and not Senator Sullivan, there is an "obvious alternative explanation" for their vote—they support Mr. Sullivan and not the Senator. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). DOJ makes no factual allegations otherwise.

Thus, DOJ's conclusory assertion that voters who wish to vote for Senator Sullivan will be unable to do so, or even accidentally back Peltola, is rank speculation and should be rejected. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 455 (2008) (concluding that courts cannot facially strike down election rules "based on the mere possibility of voter confusion."). Indeed, DOJ seems to realize this. Lacking any

---

https://www.wsj.com/politics/elections/justice-department-sues-to-block-alaska-senate-results-if-gop-candidate-loses-c2597f6c.

[10] *See* NRSC, LISTEN: Senator Sullivan and NRSC Release New Radio Ad Jingle (Oct. 16, 2026), https://www.nrsc.org/press-releases/listen-senator-sullivan-and-nrsc-release-new-radio-ad-jingle-2026-10-16/.

[11] NRSC, *supra* note 10.

concrete evidence that voters are or will be confused, DOJ demands *an investigation* "to determine whether votes cast for Daniel J. Sullivan were meant to be cast for Senator Sullivan." Compl. ¶ 44. But DOJ provides no factual basis to second-guess Alaska voters' choices.

## IV. DOJ seeks impossible and unlawful relief.

There is more. Even aside from DOJ's lack of a legal claim, lack of authority to sue, and lack of factual allegations of voter confusion, DOJ also seeks relief that is both impossible and unlawful. DOJ asks the Court to prohibit Alaska from certifying the results of the U.S. Senate election if "(1) Senator Sullivan does not win the election; and (2) had all votes cast for Daniel J. Sullivan been cast instead for Senator Sullivan and Alaska's rank-choice process played out accordingly, Senator Sullivan would have won the election." Compl. ¶ 42. DOJ then demands an "investigation to determine whether votes cast for Daniel J. Sullivan were meant to be cast for Senator Sullivan and any further procedures or relief this Court deems necessary and appropriate to determine what the result would have been absent Daniel J. Sullivan's inclusion on the ballot." *Id.* ¶ 44. In other words, if Senator Sullivan wins, DOJ wants the election certified. But if he loses, DOJ wants the Court to assume that every vote cast for Mr. Sullivan should have been cast for Senator Sullivan instead, to forbid the State from certifying Peltola's victory if that hypothetical would change the result, and to order an undefined "investigation" by an unspecified party into the motivations of voters who cast ballots for Mr. Sullivan.

The Court cannot lawfully do any of that.[12] DOJ's requested "investigation" into voter motivations is particularly problematic. Although DOJ asks the Court to assume that everyone who will cast a ballot for Daniel J. Sullivan intends to vote for Senator Sullivan, it is much more likely that voters will vote for the candidates they actually support. And a post-election investigation into whether voters really meant to vote for the candidate they chose would be unprecedented in the history of American elections. DOJ cites no authority suggesting that the Court can direct a post-election investigation into voter motivations, and as a general matter, the Court lacks the authority to "order a federal agency to conduct an investigation at [the] behest" of a litigant. *Altheide v. Nevada*, No. 2:24-CV-01526-CDS-EJY, 2025 WL 3496792, at *3 (D. Nev. Dec. 4, 2025) (citing *United States v. Chavez*, 566 F.2d 81, 81 (9th Cir. 1977)).

Moreover, it would be impossible for DOJ or any other government agency to conduct the investigation DOJ demands in any reliable manner. The investigation would need to determine whether "votes cast for Daniel J. Sullivan" should have "been cast instead for Senator Sullivan." Compl. ¶ 42. But it would not even get off the ground, because there is no way to determine which voters cast votes for Mr. Sullivan. Ballots are secret, and they are only counted after they are separated from the voter's identifying

---

[12] The Complaint's failure to identify relief that the Court can lawfully grant is an independent reason to dismiss for failure to state a claim. *See, e.g.*, *Gerosa v. Savasta & Co.*, 329 F.3d 317, 323 (2d Cir. 2003) (district court should have dismissed complaint where "there is no remedy available . . . to redress the grievance alleged"); *Berry v. Fed. Bureau of Investigation*, No. 17-CV-143-LM, 2018 WL 708155, at *4 (D.N.H. Feb. 5, 2018) (dismissing complaint where "the relief sought in the complaint is not available").

information and commingled with other ballots. AS §§ 15.15.180, 15.15.230, 15.15.260, 15.20.061(c), 15.20.064(c), 15.20.203(e)–(f). So investigators would have to ask the voters. But almost by definition, DOJ's hypothetical confused voter would not *know* they had voted for Mr. Sullivan—after all, according to DOJ, they meant to vote for Senator Sullivan. And at the same time, in the context of a heated post-election fight, Senator Sullivan's supporters would face an extraordinary temptation to claim that they had accidentally voted for Mr. Sullivan, whatever the truth. That is why the *actual* ballots cast—and not a retrospective investigation—are the only reliable evidence of voter intent. *Fischer v. Stout*, 741 P.2d 217, 221 (Alaska 1987) (finding that markings on a ballot provided "clear evidence of the voters' intent").

Moreover, even if conducting DOJ's proposed investigation were possible, the investigation would violate Alaskans' bedrock constitutional rights. Most obviously, interrogating voters about their choices would violate voters' strong and long-standing "right to a secret ballot," which is "one of the fundamental civil liberties of our democracy." *Anderson v. Mills*, 664 F.2d 600, 608 (6th Cir. 1981); *see also Buckley v. Valeo*, 519 F.2d 821, 867 n.117 (D.C. Cir. 1975) ("In this country a person's right to vote secretly is inviolate."), *aff'd in relevant part*, 424 U.S. 1 (1976); *D'Aurizio v. Borough of Palisades Park*, 899 F. Supp. 1352, 1359 (D.N.J. 1995) ("The secret ballot is central to our concepts of democracy and ordered liberty."); Alaska Const. art. V, § 3 (guaranteeing secrecy of voting). It is hard to imagine a more egregious violation of "the hard-won right to vote one's conscience without fear of retaliation" than an individualized inquiry into voter

motivations by government officials. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995).

DOJ's proposed investigation would also violate the Due Process Clause. Many Alaskans have already cast their ballots. Those who voted before DOJ brought its Complaint operated under the natural assumption that their votes would be tabulated, and the election certified, under Alaska's election laws. The investigation DOJ envisions would change the rules in the middle of the election, potentially invalidating already-cast ballots and thereby violating the due process rights of the voters who cast them. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074–79 (1st Cir. 1978) (invalidating, on due process grounds, *ex post facto* change in state election rules after votes were already cast). And the investigation would violate Alaskans' equal protection rights by subjecting different classes of voters and different candidates to "arbitrary and disparate treatment." *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Voters who say they voted for Daniel J. Sullivan—and *only* those voters—would apparently be given the opportunity to retroactively change their vote to Senator Sullivan. No other Alaska voters would be afforded such an opportunity, and no other candidate—including Peltola—would be offered the same benefit.

Finally, DOJ's unjustifiable delay in bringing this case forecloses the relief it seeks. Daniel J. Sullivan's placement on the ballot was litigated and resolved months ago, with the Alaska Supreme Court resolving the matter on June 29, 2026. *See* Compl. ¶ 24. If DOJ had concerns (and the legal authority to raise them, which it does not), it could have

participated in that litigation or, at the very least, sued then. Had it done so, DOJ could have sought far narrower relief that would not disrupt an ongoing election and would not prejudice Peltola by preventing the certification of the election if she wins, such as an order redesigning the ballot or removing Mr. Sullivan from it. Yet DOJ waited until days before the general election, after many Alaskans had already cast their ballots, when the only relief even theoretically available is an unprecedented injunction against certification plus an impossible post-election investigation. DOJ's "long delay in seeking equitable relief," and the immense prejudice that voters, candidates, and Alaska state election officials will suffer if DOJ prevails, "preclude [DOJ] from gaining the disruptive remedy it now seeks." *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 217, 221 (2005).

## V. *Purcell* separately bars DOJ's requested relief.

The *Purcell* principle independently bars DOJ's requested relief. The Supreme Court has "repeatedly cautioned that lower federal courts should not alter the election rules of a state on the eve of an election." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sep. 25, 2026) (citation modified) (collecting cases). Courts should not impose late election rule changes due to the ensuing "voter confusion and consequent incentive to remain away from the polls," which undermines the "[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). "The democratic consequences can be even more dire if courts intervene only after votes have been counted." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026). Thus, *Purcell* "applies

with even greater force" where—as here—the "election is not merely upcoming; it has already started." *People Not Politicians*, 2026 WL 2883222, at *2.

Polls close in nine days. Voting in Alaska has been underway for over two weeks. Absentee ballots were sent out weeks ago, and early in-person voting has commenced. Concerns of late-stage court-ordered changes wreaking election chaos and voter confusion are thus at their zenith here, where ballots have already been cast. Even if DOJ had anything close to a colorable claim, which it does not, the time to raise that claim was in June, when the issue of Mr. Sullivan's inclusion on the ballot was litigated and resolved, or, at the very latest, when the ballot design of the general election ballot was finalized in August. *See Yazzie v. Hobbs*, 977 F.3d 964, 969 (9th Cir. 2020) (rejecting late challenge to a long-standing election rule). At this late stage of the election, a court-ordered change to election procedures "in the midst of an ongoing election would usher in electoral chaos." *People Not Politicians*, 2026 WL 2883222, at *2.

DOJ's request for an unprecedented post-election remedy—enjoined certification followed by an investigation—makes all of this worse, not better. "Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." *Bost*, 607 U.S. at 80 (quoting *Bush v. Gore*, 531 U.S. 1046, 1047 (2000) (Scalia, J., concurring in grant of stay)). Indeed, Alaskans for Mary and DSCC have reason to fear that is DOJ's intent in bringing this case. The Court must not enable it.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

Dated: October 25, 2026.

REEVES AMODIO LLC
Attorneys for Proposed Intervenors

By: /s/ *Thomas P. Amodio*
Thomas P. Amodio, ABA #8511142
*tom@reevesamodio.com*

By: /s/ *Lily Ginsburg*
Lily Ginsburg, ABA #2411117
*lginsburg@reevesamodio.com*

By: /s/ *Kevin M. Boots*
Kevin M. Boots, ABA #0912090
*kevin@reevesamodio.com*

500 L Street, Suite 300
Anchorage, Alaska 99501
Telephone: (907) 222-7100

David R. Fox*
Joshua Abbuhl*
Qizhou Ge*
Max C. Accardi*
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 948-1135
*dfox@elias.law*
*jabbuhl@elias.law*
*age@elias.law*
*maccardi@elias.law*

**Pro Hac Vice* Applications Forthcoming

Attorneys for Proposed Intervenors
Alaskans for Mary and DSCC

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2026, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:26-cv-00376-SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Kevin M. Boots*
Kevin M. Boots