STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-9500
Email: Stanley.Woodward@usdoj.gov

E. BRYAN WILSON
Assistant U.S. Attorney
U.S. Attorney's Office
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
Email: Bryan.Wilson@usdoj.gov

Attorneys for the Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>State of Alaska; Carol Beecher, in her official capacity as Director of the Division of Elections of the State of Alaska; the Election Boards of the State of Alaska; and the State Ballot Counting Review Board of the State of Alaska.<br><br>Defendants. | Civ. No. 3:26-cv-00376-SLG<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**[1]<br><br>**ACTION SEEKING STATEWIDE RELIEF** |

Plaintiff, the United States of America, hereby alleges as follows:

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(1).

## INTRODUCTION

1. Dan S. Sullivan ("Senator Sullivan") has represented the State of Alaska in the United States Senate since 2015. He is running for reelection as a Republican in November 2026, in what most observers believe will be a close race against Peltola.

2. The New York Times has reported that operatives aligned with Peltola spent months recruiting candidates to take votes away from Senator Sullivan. Although what the New York Times reports is not always true, its reporting here aligns with what the United States has been alleging on information and belief. It also aligns with common sense. As part of what was internally called the "Ballot Composition Project," Ms. Peltola's team reportedly worked with people trying to recruit another candidate named Dan Sullivan to confuse voters.[2]

3. The reported plan seemingly worked, and Daniel J. Sullivan decided to run for Senator in 2026 as a Republican with the intention of misleading supporters of Senator Sullivan into voting for him. The sole purpose of his candidacy is to benefit the Peltola campaign by reducing the number of votes for Senator Sullivan.

4. Congress has tasked state officials with "protect[ing] the integrity of the electoral process," 52 U.S.C. § 20501(b)(3), and the Supreme Court has long recognized that states "ha[ve] an interest, if not a duty, to protect the integrity of its political processes

---

[2] *See* Kellen Browning, *Inside Democrats' Secret Effort to Stack Alaska's Ballot*, N.Y. Times (Oct. 28, 2026), available at https://www.nytimes.com/2026/10/28/us/politics/alaska-dan-sullivan-conspiracy-peltola.html.

from frivolous or fraudulent candidacies." *Bullock v. Carter*, 405 U.S. 135, 145 (1972); *see also Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in … avoiding confusion, deception, and even frustration of the democratic process at the general election.").

5. Should Alaska certify any electoral results tainted by the inclusion on the ballot of Daniel J. Sullivan—whose candidacy, Defendant Beecher found, is "for the purpose of confusing or misleading voters and compromising the fairness of the ballot"[3]—the State and its officers will fail in their obligations to protect the integrity of its election and obstruct Congress's purposes and objectives in enacting various election integrity laws. The United States accordingly brings this lawsuit to protect the integrity of the 2026 Senate election in Alaska.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345 because the United States is a plaintiff and brings a claim under federal law.

7. Declaratory relief is authorized by 28 U.S.C. §§ 22021-2202.

8. Venue is proper under 28 U.S.C. § 1391(b)(1) because all defendants reside in the District of Alaska.

9. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the United States' claim occurred and will occur in

[3] Ex. A, at 2 (Letter from Carol Beecher, Director, to Daniel J. Sullivan (June 15, 2026)).

this District, including the administration and conduct of the November election for Senate, the counting of ballots in that election, and the certification of the result of that election.

## PARTIES

10. Plaintiff is the United States of America, represented by the Attorney General. The Attorney General is authorized to "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out" Chapter 205 of Title 52 of the U.S. Code. 52 U.S.C. § 20510(a).

11. Defendant State of Alaska is one of the fifty states making up the United States.

12. Defendant Carol Beecher is sued in her official capacity as Director of Alaska's Division of Elections. The Director "act[s] for the lieutenant governor in the supervision of central and regional election offices, . . . and the administration of all state elections . . . . The director is responsible for the coordination of state responsibilities under the [National Voter Registration Act (NVRA)]." A.S. § 15.15.105. The Director is responsible for "provid[ing] general administrative supervision over the conduct of state elections." *Id.* § 15.15.010. She also "shall review the counting of the ballots with the assistance of and in the presence of the appointed representatives from the political parties." *Id.* § 15.15.420.

13. Defendant Election Boards of the State of Alaska are tasked with counting ballots following an election, A.S. § 15.15.360, and "mak[ing] a certificate . . . of the results" after "the count of ballots is completed," *id.* § 15.15.370. There is at least one

election board appointed in each precinct and composed, by default, of at least three qualified voters registered to vote in that precinct. *Id.* § 15.10.120(a); *see id.* § 15.10.125 ("In each precinct having 200 or more voters additional election boards may be appointed."). "The election board shall, immediately upon completion of the certificate or as soon thereafter as the local mail service permits, send in one sealed package to the director one copy of the certificate and the register." *Id.* § 15.15.370.

14. Defendant State Ballot Counting Review Board of the State of Alaska is made up of members appointed by the Director. A.S. § 15.180. "The state ballot counting review shall begin as soon as practicable after the election is completed and not later than 16 days after an election and shall be continued until completed." *Id.* § 15.15.440. "The director shall close the review when the director is satisfied that no missing precinct certificate of election would, if received, change the result of the election." *Id.*

15. After all certificates from election boards have been received, and the state ballot counting review process (over which the Director has certain oversight responsibility, A.S. § 15.15.440) has been completed, "the director shall certify the person receiving the largest number of votes for the office for which that person was nominated or elected, as applicable." *Id.* § 15.15.450. "The director shall issue to the elected candidate[] . . . a certificate of their election or approval." *Id.*

## **STANDING**

16. The United States has a substantial and legally cognizable interest in maintaining the integrity of elections. *See* 52 U.S.C. §§ 20501(b)(3), 20510(a). The United

States suffers an injury in fact whenever federal law is violated, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), including when remedying such a violation is necessary to safeguard the sacred right of its citizens to vote, *see United States v. Raines*, 362 U.S. 17, 27 (1960). The United States likewise suffers an injury when the certification of the election for a federal office is tainted by a frivolous candidacy because that undermines confidence in the make-up and workings of the federal government.

17. Defendants are each substantially involved in the administration of elections in Alaska, including the 2026 election for Senator, as well as the collection, counting, and certification process following the election.

18. An order declaring a certification of an election result prejudiced by Daniel J. Sullivan's inclusion on the ballot unlawful and enjoining defendants from allowing such a certification to occur would redress the United States' injuries.

## BACKGROUND

### *A. Daniel J. Sullivan's Senate Campaign*

19. On or about May 16, 2026, Senator Sullivan filed to run for reelection to the United States Senate.

20. On or about May 29, 2026, Daniel J. Sullivan filed to run for election to the Senate. Daniel J. Sullivan's candidacy was the result of the Peltola campaign's so-called Ballot Composition Project.

21. According to the New York Times, aides with the Democratic Senatorial Campaign Committee (DSCC) introduced a veteran Democratic operative named Jerid Kurtz as a specialist in secret ballot maneuvers to top Peltola campaign aides. Kurtz contacted Daniel J. Sullivan.

22. Daniel J. Sullivan had never previously run for political office. He was a longtime supporter of Ms. Peltola and other Democratic politicians. He told Kurtz that, although he had no interest in being a politician, he would run for Senate if it would help Ms. Peltola.

23. Daniel J. Sullivan took several measures designed to dupe Alaska's voters into believing that he is Senator Sullivan, as detailed below, prompting complaints to the Alaska Division of Elections.

24. On June 15, the Alaska Division of Elections (in a letter issued by Defendant Beecher) found that Daniel J. Sullivan's declaration of candidacy "was not properly filed with the Division because it was not filed in order to declare an actual good-faith candidacy for the office of United States Senator but was instead filed with a purpose to confuse or mislead and to thereby compromise the ballot's fairness or neutrality." Ex. A, at 2.

The Alaska Division of Elections detailed several facts (Ex. A, at 1-2) supporting its conclusion that Daniel J. Sullivan is running for Senate to dupe voters who intend to vote for Senator Sullivan into voting for him:

a. Daniel J. Sullivan requested that the ballot display his name as "Dan Sullivan"—the same name used by Senator Sullivan. Daniel J. Sullivan did not register to vote under the name "Dan Sullivan."

b. According to the Division, Daniel J. Sullivan "requested to be designated on the ballot as affiliated with the Republican Party"—the same party as Senator Sullivan—but had never previously "been affiliated with the Republican Party in Alaska." His choice to "change [his] affiliation to the same political party … as the incumbent Senator … immediately before filing a declaration of candidacy in which [he] asked to access the ballot under the same name – in a shortened form [he'd] never used before - as the incumbent Senator strongly suggests an intent to confuse [him]self with the incumbent Senator rather than to distinguish [him]self from him."

c. Although Daniel J. Sullivan decided to run as a Republican, he worked with a political consultant who is "a known longtime supporter of Democratic candidates including the primary Democratic challenger to Senator Sullivan." Additionally, Daniel J. Sullivan admitted in a July 18, 2026, interview with The New York Times that he voted for Democrats in the last three presidential elections and voted for Peltola when she ran for Congress.

d. Daniel J. Sullivan's "public campaign website … uses a format, color scheme and overall theme similar to the public website for Senator Sullivan's campaign … This again suggests an intention not to distinguish yourself from the incumbent Senator as any candidate genuinely seeking office would do, but to confuse Alaskans as to which 'Dan Sullivan' is which."

25. Not only was the Division of Elections' conclusion reasonable based on the evidence available to it at the time, but the conclusion is also consistent with later investigative reporting from the *New York Times* "based on interviews over the past two months with 12 people who participated in or were told of" the Ballot Composition Project and/or the plan to recruit spoilers (including a second Dan Sullivan) to the ballot. *See* Browning, *supra*.

26. Daniel J. Sullivan sought judicial review of the Division's determination. A trial court held that the Division erred in excluding Daniel J. Sullivan from the ballot. *Daniel J. Sullivan, Jr. v. Division of Elections*, No. 3AN-26-07485CI (Alaska Sup. Ct. June 26, 2026). The Alaska Supreme Court summarily affirmed and indicated that a "full

opinion will be issued at a later date." *Alaska v. Daniel J. Sullivan, Jr.*, No. S-19935 (Alaska June 29, 2026). The Alaska Supreme Court has yet to issue that opinion.

27. The DSCC celebrated alongside the Peltola campaign at the judicial ruling, recognizing the confusion that inclusion of Daniel J. Sullivan would cause. As one DSCC employee wrote in an internal group chat: "Other Dan won, will be on ballot." "Three people—two Peltola aides and a member of the D.S.C.C. staff—reacted with heart emojis." Browning, *supra*.

28. As a result of the Alaska Supreme Court's summary decision, Daniel J. Sullivan will be included on Alaska's ballot for the November 2026 general election.

*B. Daniel J. Sullivan's campaign threatens to mislead Alaska's voters in the general election.*

29. Alaska uses a two-step process for electing Senators and other officials. In the primary election, all candidates appear on the ballot, regardless of political party. With irrelevant exceptions, "only the four candidates who receive the greatest number of votes for any office shall advance to the general election." AK Stat. § 15.25.010.

30. The general election is "conducted by ranked-choice voting." AK Stat. § 15.15.350(c). Voters rank their candidates in order of preference and do not have to rank all candidates.

31. "The election board shall initially tabulate each validly cast ballot as one vote for the highest-ranked continuing candidate on that ballot or as an inactive ballot. If a candidate is highest ranked on more than one-half of the active ballots, that candidate is

elected and the tabulation is complete." A.S. § 15.15.350(d). Otherwise, "votes cast for the defeated candidate shall cease counting for the defeated candidate and shall be added to the totals of each ballot's next-highest-ranked continuing candidate." § 15.15.350(d)(2).

32. For example, consider a citizen who lists Candidate A as his first choice, Candidate B as his second choice, Candidate C as his third choice, and Candidate D as his fourth choice. If Candidate A receives the fewest first-place votes, then he is eliminated, and the citizen's vote is transferred to Candidate B. If Candidate B now has the most first-place votes, then that candidate wins the election.

33. Alaska held its primary election on August 28. Peltola received 49.5% of the vote, Senator Sullivan received 41.4% of the vote, Daniel J. Sullivan received 2.5% of the vote, and Republican Gerald Heikes received 1.1% of the vote. Those candidates will be on the ballot in the November general election.

34. As a result of Daniel J. Sullivan's inclusion on the November ballot, the ballot will appear confusing to voters looking to vote for Senator Sullivan, as demonstrated by a sample ballot:

//

//

**State of Alaska Official Ballot**
**November 3, 2026**
**General Election**

Federal Only

301

**A candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or group or that the party or group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the political party or political group.**

**Instructions:**

- Do not use red ink or a pencil to mark your ballot.
- Rank as many or few candidates as you like.
- Completely fill in no more than one oval for each candidate or column.
- For your 1st choice, fill in the oval in the first choice column.
- For your 2nd choice, fill in the oval in the 2nd choice column.
- For your 3rd choice, fill in the oval in the 3rd choice column, and so on.
- **If you make a mistake, you can ask for a new ballot.**

**United States Senator**

| | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| **Heikes, Gerald L.** (Registered Republican) | | | | | |
| **Peltola, Mary** (Registered Democrat) | | | | | |
| **Sullivan, Daniel J. Jr.** | | | | | |
| **Sullivan, Dan S.** (Registered Republican) Incumbent | | | | | |
| **Write-in:** | | | | | |

**United States Representative**

| | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| **Begich, Nick** (Registered Republican) | | | | | |
| **Hafner, Eric** (Registered Democrat) | | | | | |
| **Hill, Bill** (Nonpartisan) | | | | | |
| **McDermott, James C. "Jim"** (Registered Libertarian) | | | | | |
| **Write-in:** | | | | | |

35. Even though the ballot distinguishes Dan S. Sullivan as a "Registered Republican" and the "Incumbent," the same was true on the August 2026 primary ballot. Nonetheless, Daniel J. Sullivan received 2.5% of the vote in that primary election.

36. Daniel J. Sullivan's presence on the ballot threatens to mislead Alaskan citizens who want to vote for Senator Sullivan. For example, some supporters of Senator Sullivan likely will inadvertently vote for Daniel J. Sullivan. Other supporters of Senator

Sullivan likely will be confused as to how to rank the three Republican candidates as to defeat Peltola. They might not rank Senator Sullivan at all, resulting in votes for Daniel J. Sullivan to be transferred to Peltola after Daniel J. Sullivan's all-but-guaranteed elimination in the first or second round of tabulations.

37. Many polls indicate that the race between Senator Sullivan and Peltola will be within one or two percentage points, and Daniel J. Sullivan received 2.5% of the vote in the primary election. Thus, there is a realistic chance that, even if a majority of Alaskans wish to vote for Senator Sullivan, Daniel J. Sullivan's presence on the ballot will result in a victory for Peltola.

*C. Peltola's Campaign Appears To Have Attempted To Deceive The Court, And Is Now Under State Investigation*

38. Apparently emboldened by the success of their reported plot to deceive Alaskan voters, Alaskans For Mary and the DSCC appear to have turned to misleading this Court.

39. The United States' original complaint alleged that Daniel J. Sullivan's declaration of candidacy was "not filed in order to declare an actual good-faith candidacy for the office of United States Senator but was instead filed with a purpose to confuse or mislead and to thereby compromise the ballot's fairness or neutrality." ECF No. 1 ¶ 22 (quoting a letter from the Alaska Division of Elections).

40. In their proposed answer, a certified pleading under Rule 11, Alaskans For Mary and the DSCC answered, in relevant part that, "Proposed Intervenors lack knowledge

or information sufficient to form a belief about the truth or falsity of the allegation concerning the purposes of Daniel J. Sullivan's candidacy and therefore deny any allegation about those purposes." ECF No. 5-1 ¶ 22.

41. But the New York Times has reported that Alaskans For Mary and the DSCC were well aware of the purposes of Daniel J. Sullivan's candidacy: they orchestrated his sham campaign for the purpose of misleading Alaskan voters and getting Peltola elected. As reported:

a. "Operatives aligned with Mary Peltola, the Democratic nominee for Senate, spent months recruiting candidates to peel votes from Senator Dan Sullivan."

b. "based on interviews and text messages, along with documents prepared for a potential lawsuit against the campaign, that not only did Ms. Peltola's team work with people trying to recruit Mr. Sullivan to run for Senate, but the effort was much broader. The group worked to coax other would-be spoilers into the race, to dilute the incumbent's support and help catapult the Democrat to victory."

c. The plot, "internally called the ballot composition project," "involved the Peltola campaign's lawyers, as well as senior aides at the Democratic Senatorial Campaign Committee."

d. Speaking directly to Mr. Sullivan's purposes for running, Mr. Kurtz told the Peltola Campaign that Mr. Sullivan was "amenable to running if it

would help Ms. Peltola" and further "said he hated Trump, and if it was going to help Mary, he liked Mary. He didn't have any interest in being a politician, but if this could help."

e. "Text messages viewed by The Times show officials with the D.S.C.C. and the Peltola campaign communicating for months about the project."

f. "The Peltola aides worried at times that Mr. Kurtz's efforts would be discovered."

g. "Throughout the spring, the campaign swapped leads with the D.S.C.C. on potential candidates and continued to participate in efforts to shape the ballot."

h. "In one exchange of text messages obtained by The Times, Peltola advisers seemed to make fun of voters while watching a focus group, surmising the participants would be susceptible to being tricked into voting for a ballot spoiler."

i. Peltola operatives described these efforts as their "scheme" and their "ballot strategy plan."

j. "There were also efforts to support the new candidates financially. Back in March, Peltola campaign employees had dinner with a local political consultant named Jim Lottsfeldt. Mr. Lottsfeldt, who works with super PACs aligned with Ms. Peltola, agreed to lead an effort to boost the long-shot Senate candidates with outside spending."

k. This subversive "scheme" "involved the party's Senate committee and its top law firm"— the Elias Law Group (the firm representing Alaskans For Mary and the DSCC in this matter).[4]

42. Alaska Governor Mike Dunleavy has announced on X that he is "directing the Department of Public Safety to investigate whether this scheme violated Alaska's laws and whether criminal charges or civil action are warranted." As Governor Dunleavy stated, the "New York Times reporting reveals disturbing new evidence of an organized effort to manipulate Alaska's elections by recruiting candidates . . . to deliberately confuse voters and misdirect their votes." "Alaskans have a fundamental right to vote for the candidate they actually intend to support. Deliberately tricking voters into casting their ballots for someone else strikes at the integrity of our elections."[5]

## CLAIMS FOR RELIEF

### Count One
### (NVRA, 52 U.S.C. §§ 20501(b)(3), 20510(a))

43. The United States incorporates all allegations stated above.

---

[4] The Elias Law Group describes itself as "the nation's go-to law firm to fight back against . . . election subversion," with a "focus[] on . . . pro-democracy litigation" and "voting rights." https://elias.law/about/ (last visited Oct. 29, 2026).
[5] Governor Mike Dunleavy (@GovDunleavy), X (October 29, 2026), https://x.com/GovDunleavy/status/2115669883149222169.

44. "The Attorney General may bring a civil action . . . for such declaratory or injunctive relief as is necessary to carry out" Chapter 205 of Title 52 of the U.S. Code, which covers the NVRA. 52 U.S.C. § 20510(a).

45. The NVRA imposes a variety of duties on States for the purpose of "protect[ing] the integrity of the electoral process." 52 U.S.C. § 20501(b)(3); *see id.* §§ 20503-20509.

46. The Supreme Court has long recognized that an important aspect of safeguarding the "integrity of [a state's] political processes" is keeping "frivolous . . . candidacies" from the ballot. *Bullock*, 405 U.S. at 145; *see Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014) (explaining that a contrary rule would require a state to let ineligible candidates "clutter and confuse our electoral ballot").

47. To be sure, *Bullock* involved including or excluding candidates from the ballot. 405 U.S. at 145. However, the State was "understandably and properly seek[ing] to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." *Id.* When the ballot contains a frivolous candidate, the same state interests remain after ballots have been cast through certification so as to assure that the State's "election machinery" is not "clogg[ed]" by frivolous candidacies that resulted in "voter confusion." *Id.* Given the Alaska Supreme Court's decision, and the fact that Daniel J. Sullivan's name is already on the ballot, the only way to "assure that the winner [of the Alaska Senate seat] is the choice of a majority, or at least

a strong plurality, of those voting," *id.*, is to ensure that the certification is not impacted by Daniel J. Sullivan's frivolous candidacy.

48. Defendant Beecher has already made the determination, in her capacity as Director of the Division of Elections, that Daniel J. Sullivan's candidacy is frivolous in that his "declaration of candidacy . . . was not filed in order to declare an actual good-faith candidacy for the office of the United States Senator, but was instead filed with a purpose to confuse or mislead and to thereby compromise the ballot's fairness or neutrality." Ex. A, at 1. That determination was reached after considering the evidence before her as she thoroughly laid out in Exhibit A, at 1-2. It is likewise supported by an independent investigation as reported recently by *The New York Times*, which shows that Daniel J. Sullivan's candidacy has always been for the purpose of creating voter confusion to boost Ms. Peltola's chances of success and not for the purpose of serving in office.

49. Given the substantial likelihood that the inclusion of Daniel J. Sullivan will confuse or mislead voters looking to cast a vote for Senator Sullivan, and thus distort the will of Alaskan voters, there is a substantial likelihood that a certification of the election will reflect an electoral process that lacked integrity.

50. To guard against this danger, it is vital that Defendants not certify any election result that may be impacted by voter confusion. An election result may be impacted by voter confusion if: (1) Senator Sullivan does not win the election; and (2) had all votes cast for Daniel J. Sullivan been cast instead for Senator Sullivan and Alaska's rank-choice process played out accordingly, Senator Sullivan would have won the election.

**Count Two**

**(Supremacy Clause – Obstacle Preemption)**

51. The United States incorporates all of the above allegations by reference.

52. Under the Supremacy Clause, the "Constitution, and the Laws of the United Sates which shall be made in pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl.2.

53. "Congress may implicitly pre-empt a state law, rule, or other state action." *Oneok, In. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015) (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)). "Although preemption often applies to state statutes, preemption can also invalidate actions of state executive branch officials . . . that conflict with federal law." *Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992); *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 357 (1988)). State law or action that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress" is preempted. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *accord ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968-69 (9th Cir. 2026).

54. As noted, federal law (the NVRA) imposes a variety of duties on States for the purpose of "protect[ing] the integrity of the electoral process." 52 U.S.C. § 20501(b)(3); *see id.* §§ 20503-20509.

55. Defendants' actions thwart "the accomplishment and execution" of federal law. *ConocoPhillips*, 177 F.4th at 968-99. Defendants are aware that Daniel J. Sullivan's inclusion on the ballot is the result of a conspiracy to undermine the integrity of the electoral process. Turning a blind eye to this scheme and certifying a result that may be impacted by the scheme would frustrate Congress's objectives in seeking to protect the integrity of the electoral process.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that this Court grant the following relief:

56. Declare that certification of any result that may be impacted by voter confusion, as defined above, would violate Defendants' duties under the NVRA to "protect the integrity of the electoral process," 52 U.S.C. § 20501(b)(3), and be preempted under the Supremacy Clause.

57. Preliminarily and permanently enjoin Defendants from certifying any result that may be impacted by voter confusion, as defined above, pending an investigation to determine whether votes cast for Daniel J. Sullivan were meant to be cast for Senator Sullivan and any further procedures or relief this Court deems necessary and appropriate to determine what the result would have been absent Daniel J. Sullivan's inclusion on the ballot.

58. Award any other relief it deems just and proper.

RESPECTFULLY SUBMITTED this October 29, 2026, in Anchorage, Alaska.

/s/ Stanley Woodward
Stanley E. Woodward, Jr.
*Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-9500
Email: Stanley.Woodward@usdoj.gov

/s/ E. Bryan Wilson
E. Bryan Wilson
Assistant U.S. Attorney
U.S. Attorney's Office
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
Email: Bryan.Wilson@usdoj.gov

**Certificate of Service**

I hereby certify that on October 29, 2026, a true and correct copy of the foregoing document was served electronically through the CM/ECF system upon all case participants who are registered CM/ECF users.

/s/ E. Bryan Wilson
Office of the U.S. Attorney