RACHEL WITTY
CIVIL DIVISION DIRECTOR

Margaret Paton Walsh
Laura Fox
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6612
Facsimile: (907) 269-3697
Email: margaret.paton-walsh@alaska.gov
laura.fox@alaska.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>State of Alaska; Carol Beecher, in her official capacity as Director of the Division of Elections of the State of Alaska; the Election Boards of the State of Alaska; and the State Ballot Counting Review Board of the State of Alaska,<br><br>Defendants. | Case No. 3:26-cv-00376-SLG<br><br>**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

Defendants Carol Beecher, in her official capacity as Director of the Division of Elections of the State of Alaska; the Election Boards of the State of Alaska; and the State Ballot Counting Review Board of the State of Alaska (collectively, "the Division") move the Court to dismiss the United States' amended complaint immediately, with prejudice, because the new complaint has no more legal basis than the original one. It rests on the

same meritless theory that the National Voter Registration Act (NVRA)—a *voter registration* law—governs this case, which has nothing to do with voter registration. Because this reading of the NVRA fails, the amended complaint fails.

The filing of an identically meritless amended complaint should not derail the Court's expedited briefing schedule given the fast-approaching election. The Court should follow the well-established principle that "lower federal courts should not 'alter the election rules' of a state 'on the eve of an election,'"[1] and expeditiously dismiss this lawsuit so that Alaska can run its election and Alaskans can head to the polls on Tuesday without the impending threat of unjustified federal interference.

## BACKGROUND

### I. Alaska's election system

Alaska's elections begin with an open, nonpartisan, top-four primary in which all candidates are listed on a single ballot and voters vote for their preferred candidate to advance to the general election.[2] Although primary candidates may choose to have their registered political party affiliation indicated on the ballot, they are not competing to become party nominees.[3] The four primary candidates receiving the most votes for an office advance to the general election regardless of party affiliation, not as the nominees of any party, but as the successful nominees of the top-four primary.[4]

---

1 *People Not Politicians v. Onder*, 609 U.S. __, 2026 WL 2883222 (Sept. 25, 2026).

2 AS 15.25.010.

3 AS 15.25.030(a)(5).

4 AS 15.25.100(a).

Then, in the general election, Alaska uses ranked-choice voting to determine the winner.[5] Each voter can rank the four (or fewer) candidates for each office in order of preference, although the voter need not rank all the candidates.[6] The Division of Elections begins the counting process by tabulating all the first-choice rankings.[7] If any candidate gets more than half the first-choice rankings, the process is complete and that candidate is the winner.[8] If no candidate gets more than half the first-choice rankings, the Division eliminates the candidate who got the fewest, and each ballot for that candidate is either reallocated to the voters' second-choice candidate,[9] or, if the voter has not ranked other candidates, the ballot counts for the eliminated candidate in the final results and is not included in further rounds of tabulation.[10] This process repeats in rounds until only two candidates are left and one of those candidates wins.[11]

---

5 AS 15.15.350(c).

6 AS 15.25.010; AS 15.25.100(a); AS 15.58.020(13) ("For a general election, you must rank the candidates in the numerical order of your preference, ranking as many candidates as you wish.").

7 AS 15.15.350(d). If a voter does not fill in the first choice oval, the Division will count that voter's highest-ranked candidate as the voter's first choice. *Id*. ("highest-ranked continuing candidate").

8 AS 15.15.350(d).

9 AS 15.15.350(d)(2).

10 AS 15.15.350(d)(2), .350(g)(2).

11 AS 15.15.350(d)(1).

## II. The 2026 elections

In Alaska's 2026 primary election, more than a dozen candidates filed to run for the office of United States Senator.[12] Among those candidates were the incumbent, Senator Daniel S. Sullivan ("Dan S."), and an Alaskan from Petersburg named Daniel J. Sullivan, Jr. ("Daniel J."). When Daniel J. filed his declaration of candidacy, he changed his party affiliation from undeclared to Republican.[13]

After the Division received complaints challenging Daniel J.'s eligibility and became concerned that he had filed his declaration of candidacy with an intent to confuse and mislead voters, the Division determined him ineligible to run as a candidate in the primary election.[14] But Daniel J. successfully appealed this determination: the Alaska Supreme Court affirmed a superior court order directing the Division to include Daniel J. as a candidate on the primary ballot.[15] The Alaska Supreme Court remanded to

---

12 *See* State of Alaska, 2026 Primary Election, Election Summary Report, Official Results, https://www.elections.alaska.gov/enr26/results/ElectionSummaryReportRPT.pdf (Aug. 18, 2026).

13 Dkt. 43 at 7, ¶ 24(b).

14 *See Sullivan v. State, Div. of Elections*, Order on Administrative Appeal at 5, 3AN-26-07485CI (Alaska Super. Ct. June 26, 2026), *available at* https://public.courts.alaska.gov/web/media/MRCF/3AN-26-07485CI/order2.pdf

15 *See State, Division of Elections v. Sullivan*, Order, S-19935 (Alaska Supreme Ct., June 29, 2026), *available at* https://appellate-records.courts.alaska.gov/CMSPublic/UserControl/OpenDocument?q=2ubl5dCVeEArChBN5bdIzg==%27.

the Division to "determine, in the first instance, how [Daniel J.] shall be listed as a candidate within the confines of existing Alaska ballot design law."[16]

To ensure that the appearance of two Daniel Sullivans on the ballot would not confuse voters, the Division designed the ballot to distinguish them as much as possible.[17] The Division included on the ballot (1) the two men's different middle initials, (2) the "Jr." that differentiates Daniel J.'s name, (3) the shortened version of the senator's name, "Dan," but the other man's full first name, "Daniel," (4) Dan S.'s longstanding Republican affiliation but not Daniel J.'s newfound Republican affiliation, and (5) the word "Incumbent" alongside Dan S.'s name to identify him as the current senator:

---

16 *Id*.

17 *See* image reproduced in Amended Complaint, Dkt. 43 at 12 ¶ 34.

| United States Senator<br>(Vote for one) |
| --- |
| ◯ **Darden, Dustin Thomas House**<br>(Registered Republican) |
| ◯ **Grauberger, Fred C.**<br>(Registered Republican) |
| ◯ **Grayson, Richard**<br>(Registered Green) |
| ◯ **Hafner, Carol "Kitty"**<br>(Registered Democrat) |
| ◯ **Heikes, Gerald L.**<br>(Registered Republican) |
| ◯ **Hill, Sidney "Sid"**<br>(Undeclared) |
| ◯ **Kohlhaas, Scott A.**<br>(Registered Libertarian) |
| ◯ **Leslie, David B.**<br>(Registered Democrat) |
| ◯ **Mayers, Richard B.**<br>(Registered Republican) |
| ◯ **McElwain, Heather**<br>(Registered Republican) |
| ◯ **Peltola, Mary**<br>(Registered Democrat) |
| ◯ **Roberts, Reece J.**<br>(Nonpartisan) |
| ◯ **Saucerman, Shirley A.**<br>(Nonpartisan) |
| ◯ **Southworth, Earl D. "Skip"**<br>(Registered Alaskan Party) |
| ◯ **Sullivan, Daniel J. Jr.** |
| ◯ **Sullivan, Dan S.**<br>(Registered Republican) Incumbent |

The primary ballots were printed accordingly, without legal challenge, and the primary election went forward on August 18.[18] The top four candidates in the primary were Mary Peltola, Dan S., Daniel J., and Gerald Heikes.[19] The general election ballots

---

18 *See* State of Alaska Official Ballot, Primary Election (Aug. 18, 2026), *available at* https://www.elections.alaska.gov/election/2026/Primary/SampleBallots/HD1.pdf.

19 *See* Dkt. 43 at 11, ¶ 33; *see also* State of Alaska, 2026 Primary Election, Election Summary Report, Official Results,

were printed with their names in September, and early voting began in mid-October. The general election ballot similarly differentiates between Dan S. and Daniel J.:

| United States Senator | | | | | |
|---|---|---|---|---|---|
| | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
| **Heikes, Gerald L.** (Registered Republican) | 1 | 2 | 3 | 4 | 5 |
| **Peltola, Mary** (Registered Democrat) | 1 | 2 | 3 | 4 | 5 |
| **Sullivan, Daniel J. Jr.** | 1 | 2 | 3 | 4 | 5 |
| **Sullivan, Dan S.** (Registered Republican) Incumbent | 1 | 2 | 3 | 4 | 5 |
| **Write-in:** | 1 | 2 | 3 | 4 | 5 |

If any Sullivan-supporting voter remains uncertain which Sullivan is which despite this clear differentiation on the ballot, the voter can ask for assistance from others[20] or look up information about the candidates using a smart phone or an election pamphlet. And if the voter is *still* uncertain, Alaska's ranked-choice voting system provides another solution: the voter can rank the Sullivans as his first and second choices. That way, if the voter's first-ranked Sullivan is eliminated, his vote would transfer to the other Sullivan. The voter's vote would not "be transferred to Peltola" as the complaint asserts, unless the voter chose to rank Peltola as his next choice instead of the other Sullivan.[21]

More than two months after the primary election—and less than two weeks before general election day—the United States filed this lawsuit. Meanwhile, many Alaskans have already cast general election ballots via absentee or early voting.

---

https://www.elections.alaska.gov/enr26/results/ElectionSummaryReportRPT.pdf (Aug. 18, 2026).

20 *See* AS 15.15.240.

21 Dkt. 43 at 13 § 36.

## LEGAL STANDARD

When considering a motion to dismiss, the Court should "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."[22] A motion to dismiss should be granted "when the complaint fails to state sufficient facts creating a plausible claim to relief."[23]

## ARGUMENT

### I. The United States fails to state a claim.

The Court should dismiss the amended complaint[24] with prejudice under Federal Civil Rule 12(b)(6) because it fails to state a claim. It suffers from both (1) a "lack of a cognizable legal theory" and (2) an "absence of sufficient facts alleged" (assuming it had a cognizable legal theory), either of which justifies 12(b)(6) dismissal.[25]

#### A. The amended complaint has no cognizable legal theory under the National Voter Registration Act.

The most straightforward reason for the Court to dismiss the amended complaint is that the National Voter Registration Act (NVRA) just does not apply here.

---

22 *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)).

23 *Moore v. Trader Joe's Co.*, 4 F.4th 874, 880 (9th Cir. 2021) (citing *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 807 (9th Cir. 2020)).

24 This motion was quickly adapted from the Division's motion to dismiss the original complaint and may contain citations to the original complaint at Dkt. 1 that have not been replaced with citations to the amended complaint at Dkt. 43. All material in the original complaint appears to be included in the amended complaint.

25 *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"Congress typically does not 'hide elephants in mouseholes.'"[26] The "elephant" here is broad authority for the Attorney General that would scrap our country's traditional allocation of responsibility to the states for running their elections. The "mousehole" in which the United States locates this elephant is a vague statement tucked into the "purposes" of the NVRA, a voter registration statute. But Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions" like this.[27] To throw in another metaphor, the United States' reading of the NVRA "would allow a small statutory tail to wag a very large dog."[28]

The United States cites two provisions of the NVRA: 52 U.S.C. §§ 20501(b)(3) and 20510(a). Neither imposes any obligations on the defendants, much less any that they are alleged to have violated in handling the two-Sullivan situation. On the contrary, the NVRA says nothing at all about ballot access, ballot design, ballot counting, election certification, or any of the issues discussed in the amended complaint.

The United States alleges that "[t]he NVRA imposes a variety of duties on States for the purpose of 'protect[ing] the integrity of the electoral process,'"[29] but it fails to mention that those "duties" all relate to *voter registration*.[30] Congress passed the NVRA

---

[26] *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 274 (2023) (quoting *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)).

[27] *Whitman*, 531 U.S. at 468.

[28] *AMG Capital Management, LLC v. Federal Trade Commission*, 593 U.S. 67, 77 (2021).

[29] Dkt. 43 at 17 ¶ 45.

[30] *See* 52 U.S.C. §§ 20503—20509.

(informally called the "motor voter" law)[31] "against a backdrop of lackluster voter registration and political participation"[32] to achieve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls."[33] But this case is not about voter registration. The amended complaint contains no allegations whatsoever about voter registration.[34]

Instead, the United States asserts alleged violation of the "findings and purposes" of the NVRA to justify its exercise of civil enforcement authority. It cites 52 U.S.C. § 20501, which contains the NVRA's "findings and purposes," coupled with 52 U.S.C. § 20510(a), which authorizes the Attorney General to "bring a civil action…for such declaratory or injunctive relief as is necessary *to carry out this chapter*."[35]

The NVRA's "findings" and "purposes," like the act's substantive provisions, all focus on voter registration and participation. The "findings" include that "the right of citizens of the United States to vote is a fundamental right,"[36] that "it is the duty of the Federal, State, and local governments to promote the exercise of that right,"[37] and that

---

31 *Gonzalez v. Arizona*, 677 F.3d 383, 394 n.10 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc*., 570 U.S. 1 (2013).

32 *Fish v. Kobach*, 840 F.3d 710, 720 (10th Cir. 2016).

33 *Husted v. A. Philip Randolph Inst*., 584 U.S. 756, 761 (2018).

34 *See* Dkt. 43 generally.

35 52 U.S.C. § 20510(a) (emphasis added).

36 52 U.S.C. § 20501(a)(1).

37 52 U.S.C. § 20501(a)(2).

"discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation…"[38] Similarly, the NVRA's "purposes" are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.[39]

Ignoring the NVRA's clear focus on voter registration, the United States plucks the third listed purpose out of context (52 U.S.C. § 20501(b)(3)) and argues that it imposes a freestanding duty on the states to "protect the integrity of the electoral process," untethered from any specific requirement of the NVRA or even the general subject of voter registration. It does no such thing. It is "well established" that such declarations "of purposes and policy" do not "create substantive or enforceable rights."[40]

---

[38] 52 U.S.C. § 20501(a)(3).

[39] 52 U.S.C. § 20501(b).

[40] *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 987 (9th Cir. 2015); *see also Commonwealth v. Biden*, 57 F.4th 545, 551 (6th Cir. 2023) ("The proposition that prologues, prefatory clauses, and purpose statements do not confer legal powers, rights, or duties is hardly controversial."); *National Wildlife Federation v. Marsh*, 721 F.2d 767, 773 (11th Cir. 1983) ("Preambles to statutes do not impose substantive rights, duties or obligations."), *abrogated in part on other grounds by Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989*); Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 173 (2016) ("[P]refatory clauses or preambles cannot change the scope of the operative clause.") (citing *Yazoo & Mississippi Valley R. Co. v. Thomas*, 132 U.S. 174, 188 (1889)).

The only other provision the United States cites (52 U.S.C. § 20510(a)) is just an enforcement section authorizing suits for "declaratory or injunctive relief" to "carry out" the NVRA.[41] It does not confer a freestanding authority on the Attorney General to sue for reasons unconnected to any substantive provision of the NVRA.

The United States' reading of the NVRA is made even more implausible by the fact that the NVRA does not even apply to all states: it exempts those that do not require voter registration or that allow same-day voter registration.[42] If Congress wanted to jettison traditional state control over elections by authorizing sweeping federal intervention with no connection to voter registration, there would be no logical reason to limit that federal power to only states that require advance voter registration.

No legal authority supports the United States' untenable reading of the NVRA; the United States offers none; and this Court should immediately reject it. The United States' reading would transform the NVRA from a voter registration law into a limitless grant of authority for federal interference in state-run elections. A vague aspirational statement in the NVRA's purpose section (combined with the act's authorization for the Attorney General to bring civil enforcement actions) cannot permit the federal government to

---

[41] 52 U.S.C. § 20510(a).

[42] *See* 52 U.S.C. § 20503(b) (exempting from the NVRA states that "which, under law that is in effect continuously on and after August 1, 1994," did not require voter registration or allowed same-day voter registration); U.S. Department of Justice, Civil Rights Division, *The National Voter Registration Act Of 1993 (NVRA)*, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last accessed Oct. 29, 2026) (acknowledging that "[s]ix States (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming) are exempt from the NVRA").

challenge any election process in any state or jurisdiction regardless of its connection—or lack thereof—to voter registration. That expansive reading contravenes the major questions doctrine, which rejects the idea that Congress would delegate "'highly consequential power' through ambiguous language."[43] Whether viewed through the elephants-in-mouseholes doctrine, the major questions doctrine, or just general statutory interpretation principles, the United States' reading of the NVRA is not plausible.

### B. The amended complaint has no cognizable legal theory under the Supremacy Clause.

The United States has filed an amended compliant adding a new count based on the Supremacy Clause.[44] This new count changes nothing because it depends entirely on accepting the same meritless legal theory behind the original count: that the NVRA controls this situation and displaces state law. As explained above, it does not. Because the NVRA—which concerns voter registration—has nothing to do with the circumstances of this case, it does not preempt state law, implicitly or otherwise. The Division's actions cannot "thwart" the execution of an inapplicable federal statute.

If the Division is correct about the NVRA, the Supremacy Clause does not supply an independent legal theory under which the Division could still be violating federal law. The Court should therefore reject the amended complaint for the exact same reasons that it should reject the original complaint: because it lacks any cognizable legal theory.

---

[43] *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 230 (2026).

[44] Dkt. 43 at 19–20 ¶¶ 51-55.

### C. The amended complaint fails to allege facts that could state a claim against the Division even if it had a cognizable legal theory.

Even if the NVRA *did* empower the United States to sue over any perceived threat to "the integrity of the electoral process," the facts stated in the complaint fail to allege any threat or identify anything the Division has done wrong.

Pointing out this pleading failure does not mean improperly wading into factual disputes at the 12(b)(6) stage. To survive 12(b)(6) dismissal, a complaint must allege enough facts to state a claim that is "plausible on its face."[45] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[46]

Here, the United States has failed to allege facts that, if true, would show that the Division is liable for violating the asserted NVRA duty to "protect the integrity of the electoral process."[47] On the contrary, the facts alleged show that the Division has acted to protect electoral integrity at every turn and will continue to do so. Back in June, the Division acted on its concerns about Daniel J.'s candidacy by finding him ineligible.[48] After the Alaska Supreme Court ordered the Division to include Daniel J. on the ballot, the Division designed the ballot to differentiate the two candidates as much as possible to

---

45 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

46 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

47 Dkt. 43 at 17 ¶ 45.

48 Dkt. 43 at 7-9 ¶ 24.

prevent voter confusion.[49] The complaint alleges that some voters may still be confused.[50] But critically, nowhere does the complaint allege that the Division is doing anything to cause voter confusion, or that the Division should be doing more to prevent it.

Nor does the amended complaint adequately allege reason to believe many voters *will* be confused. The complaint reproduces an image showing the five ways that the general election ballot design clearly distinguishes the two Sullivans.[51] If any voter remains confused, Alaska law allows voters to receive assistance from others.[52] And if the voter is *still* uncertain, he can rank both Sullivans as his first and second choices under Alaska's ranked-choice voting system so that his vote will count for either Sullivan over any other candidate. The complaint speculates that a confused voter wishing to vote for the senator "might not rank Senator Sullivan at all,"[53] but alleges no facts to support that speculation, much less the notion that such voters exist in large numbers.

The amended complaint then alleges that Daniel J.'s presence "threatens" to mislead voters, that some Dan S. supporters "likely will inadvertently vote for Daniel J." and "might not rank Senator Sullivan at all," and that "there is a realistic chance" that Daniel J.'s presence "will result in a victory for Peltola."[54] These allegations are too

---

49 Dkt. 43 at 12 ¶ 34.

50 *Id.*

51 *Id.*

52 AS 15.15.240.

53 Dkt. 43 at 13 ¶ 36.

54 Dkt. 43 at 12 ¶ 36-37.

speculative. Well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct" by the defendant.[55] Even setting aside that none of this is misconduct by the Division, allegations of a "threat" and a "realistic chance" of widespread voter confusion lack "facial plausibility" because they do not "allow[] the court to draw the reasonable inference" that problems will occur.[56]

The United States' allegations about Daniel J.'s motives as a candidate also do not suffice to state an NVRA claim against the Division, albeit for different reasons. As the amended complaint outlines, the Division shared in the concerns about Daniel J.'s motives.[57] The added allegations about breaking news confirm the Division's original concerns. And the Court can assume the United States' factual assertions about Daniel J. to be true for 12(b)(6) purposes.[58] But the Alaska Supreme Court concluded that these concerns did not allow the Division to disqualify him from the ballot under Alaska law.[59] The United States did not intervene in that litigation, which concluded months ago. Daniel J.'s motives do not give rise to a claim against the Division. Nor does Daniel J. *wanting* to confuse voters say anything about whether he will *succeed* in doing so, particularly given the Division's ballot differentiation. The Court need not await the

---

55 *Iqbal*, 556 U.S. at 679.

56 *See id.* at 678.

57 Dkt. 43 at 7-9 ¶ 24.

58 *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003) ('In determining whether dismissal was properly granted, we assume all factual allegations are true and construe them in the light most favorable to the plaintiff.").

59 Dkt. 43 at 9-10 ¶ 26.

United States' proposed discovery about Daniel J.'s motives because even assuming the worst about them, the complaint still fails to state a claim.

Because the allegations in the amended complaint do not support a claim that the Division has violated the NVRA—or any other federal law—the complaint fails to state a claim for relief and should be dismissed with prejudice under Federal Civil Rule 12(b)(6).

## II. The United States lacks standing to bring this suit.

Additional (and overlapping) flaws in the United States' case mean that the Court can also dismiss the complaint for lack of standing under Federal Civil Rule 12(b)(1). The United States lacks standing because Alaska's administration of its elections is not harming the United States. In fact, the relief it requests would *cause* the harm the United States says it wants to avoid by undermining confidence in the election.

The United States must establish three elements to have standing: first, it must have "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."' "[60] Second, it must establish "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'"[61] Third, the United States must demonstrate redressability—i.e. it "must show that it is *likely*, as opposed to merely *speculative*, that its injury will be

---

60 *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

61 *Id*.

redressed by a favorable decision" from the Court.[62] The United States' complaint does not satisfy any of these three elements.

First, the United States has suffered no injury in fact. Even assuming it "suffers an injury in fact whenever federal law is violated,"[63] the complaint does not allege a violation of any federal law. As explained above, the NVRA imposes no requirements that are relevant here. The Court does not decide the merits to decide injury, but the United States' NVRA theory is "so insubstantial" or "otherwise completely devoid of merit as not to involve a federal controversy."[64] Nor does a "frivolous candidacy" in a state election injure the United States.[65] The United States has no legal authority over how candidates secure their place on the ballot in state elections; only the federal constitution's qualifications clause constrains a state's rules.[66] And the United States also has no legally cognizable interest in securing a particular election outcome.[67] Plus, a "threatened injury must be *certainly impending* to constitute injury in fact."[68] The United States' claimed injury depends on uncertain contingencies that may never occur (i.e.,

---

62 *Id*. at 561. *See also Bernhardt v. County of Los Angeles*, 279 F.3d 862, 869 (9th Cir. 2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

63 Dkt. 43 at 6 ¶ 16.

64 *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

65 Dkt. 43 at 18 ¶ 47.

66 *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995).

67 *See* Dkt. 43 at 18 ¶ 50.

68 *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Dan S. losing the election by a slim margin), and such " '[a]llegations of *possible* future injury' are not sufficient" to establish injury in fact.[69]

Second, the United States has not established a causal connection between any alleged conduct of the defendants and any purported injury. The Division has taken every legally available step to minimize voter confusion by clearly differentiating the two Sullivans on the ballot. Most of the amended complaint's allegations are about conduct by third parties such as Daniel J., not the Division. The closest the United States comes to tying the Division to any alleged NVRA violation is its suggestion that *if* Dan S. loses the election by a slim margin and the Division certifies the results, *that* conduct would violate the "purpose" of the NVRA.[70] But again, that scenario may never materialize.

To the extent that the United States' causation theory rests not on what the defendants are doing now, but rather on what they've already done in the past or might do in the future, it suffers from mootness or ripeness problems. If the "challenged action"[71] was including Daniel J. on the ballot in the first place, now is too late. The Alaska Supreme Court ordered that Daniel J. be included, the Division was bound by that decision, and no timely challenges were brought to how the Division chose to implement that decision. Not only have ballots been printed and mailed out to absentee voters, but

---

69 *Id*. (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

70 Dkt. 43 at 2-3 ¶ 4, 18 ¶ 50, 20 ¶¶ 56-57.

71 *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

early in-person voting has begun.[72] If the United States wanted to keep Daniel J. off the ballot, it should have intervened in the earlier litigation over that issue. Alternatively, if the "challenged action" is the future certification of the election result—but only in the event that Dan S. loses—this claim is not yet ripe and may never become so.

Third—and most problematic—the United States has not established redressability. The United States clearly believes that Daniel J. should not be on the ballot, but the Court cannot do anything to remove Daniel J. from the ballot at this point. November 3 is just days away, and many Alaskans have already voted.

Nor can the Court order relief that would allow the United States or the Division "to determine what the result would have been absent Daniel J. Sullivan's inclusion on the ballot."[73] Nobody can determine whether a given Daniel J. voter meant to vote for Dan S. instead. No pattern of ballot markings will reveal any voter's reason for voting for Daniel J., regardless of how the voter ranks the candidates on the ranked-choice ballot. And the ballot markings will be the only evidence of voters' intent. Ballots cannot be associated with voters to allow the state or federal government to follow up with Daniel J. voters about their true intentions. Like every state in the union, Alaska protects the secrecy of the ballot by law,[74] and such an investigation would require violating that secrecy. Delaying certification would not redress any injury because the proposed

---

72 *See, e.g.*, AS 15.20.064(a).

73 Dkt. 43 at 20 ¶ 57.

74 Alaska Const. art. V, § 3 ("Secrecy of voting shall be preserved.").

"investigation" into how many voters mistakenly voted for Daniel J. is impossible. Nor would a bare declaration casting doubt on the election redress any injury either—on the contrary, it would *cause* the very injury that the United States seeks to avoid by sowing confusion and eroding trust in Alaska's election result.

Because the amended complaint fails to establish any of the three requirements for Article III standing—injury, causation, or redressability—Rule 12(b)(1) warrants dismissal too. But again, the most straightforward path for the Court here is to recognize under 12(b)(6) that the complaint lacks any cognizable legal theory.

**III. This lawsuit and the relief requested violate the Elections Clause.**

Not only does amended complaint fail to state a claim under the NVRA, but this lawsuit is also inconsistent with this country's federal constitutional structure.

The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."[75] This means the Constitution "invests the States with responsibility for the mechanics of congressional elections" unless Congress legislates to preempt state choices.[76] Because Congress has not done that here, the issues raised in the complaint remain the State of Alaska's business, not the United States's.

---

75 U.S. Const. Art. I, § 4, cl. 1.

76 *Foster v. Love*, 522 U.S. 67, 69 (1997).

As the D.C. District Court has observed, the Constitution's "allocation of authority over federal elections between Congress and the States" is "no accident," but rather was "the product of carefully considered compromises among our Constitution's Framers."[77] The "diffusion of power" between Congress and the states was intended to "preserve and restore to the people their equal and sacred rights of election" against "the influence of ambitious or popular characters, or in times of popular commotion, and when faction and party spirit run high."[78] The President was not given a role in regulating elections; "[e]xecutive regulatory authority over federal elections does not appear to have crossed the Framers' minds."[79] So "[t]he States have initial authority to regulate elections," and then "Congress has supervisory authority over those regulations."[80]

Here, Congress has passed no statute addressing any facet of the circumstances discussed in the complaint: no statute about similar-named candidates, no statute about preventing voter confusion, and no statute about questionable candidate motives. Nor has Congress passed a statute authorizing the kind of relief requested here, which is to delay state certification of an election result pending an open-ended "investigation." The United States is asking this Court to create and apply rules that Congress never enacted. This is

---

77 *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 44 (D.D.C. 2025), *aff'd sub nom. League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

78 *Id*. (quoting The Massachusetts Convention: Convention Debates (Jan. 16, 1788)).

79 *Id*.

80 *Id*.

unlawful: Congress's power to regulate elections supersedes state law only "so far as it is exercised, and no farther."[81] Here, Congress has not exercised its power at all.

This argument overlaps with the merits, but that is not a flaw: the Elections Clause reinforces the points above by providing the backdrop for interpreting the NVRA. The Framers purposely assigned primary responsibility to the states. Though Congress can step in to override state rules, it is not plausible to believe that Congress meant the purposes section of the NVRA to authorize the federal intervention requested here.

The cases that the United States invokes about voter confusion—*Bullock v. Carter*,[82] *Jenness v. Fortson*,[83] and *Lindsay v. Bowen*[84]—only confirm that this is an issue for *the State* to deal with, not the federal government. *Bullock* and *Jenness* explain that "*a State* has a legitimate interest in regulating the number of candidates on the ballot" to "prevent the clogging of its election machinery" and "avoid voter confusion."[85] None of these cases holds that states *must* do this, much less do it in any specified way. In fact, *Bullock* disallowed Texas's unduly high filing fees, thus placing outer limits on states' power to exclude purportedly non-serious candidates from the ballot.[86] As for *Lindsay*, it

---

81 *Watson v. Republican Nat'l Comm*., 609 U.S. 672, 697 (2026) (quoting *Ex parte Siebold*, 100 U.S. 371, 386 (1879)).

82 405 U.S. 135, 145 (1972).

83 403 U.S. 431, 442 (1971).

84 750 F.3d 1061, 1064 (9th Cir. 2014).

85 *Bullock*, 405 U.S. at 145 (1972) (quoting *Jenness*, 403 U.S. at 442) (emphasis added).

86 *See id.* at 145–49.

held only that a state may keep an unqualified candidate off its ballot without violating free association or equal protection.[87] None of these cases held that a state must exclude particular kinds of candidates from the ballot, or that the United States can force a state to attempt to retroactively undo a candidate's participation after the fact.

Not only has Congress not exercised its supervisory power over state election rules in any way relevant here, but even Congress couldn't necessarily authorize the unusual and drastic remedy that the United States seeks, which is a rule indefinitely halting certification of an election result but only if a specific, favored candidate "does not win."[88] "[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints."[89] The relief sought here would go well beyond appropriate procedural regulation. But regardless of whether Congress *could* authorize it, Congress certainly has not done so.

The United States' requested interference with state election administration thus contravenes the Elections Clause, providing another reason to dismiss this suit.

---

87 *Lindsay*, 750 F.3d at 1064–65.

88 *See* Dkt. 43 at 18 ¶ 50, 20 ¶ 57 (seeking injunctive relief in circumstances limited to where "Senator Sullivan does not win the election").

89 *U.S. Term Limits*, 514 U.S. at 833–34.

## CONCLUSION

For these reasons, the Court should promptly dismiss the amended complaint with prejudice so that Alaska can proceed to administer its elections consistent with state and federal law and without unwarranted interference by the United States.

DATED: October 29, 2026.


RACHEL WITTY
CIVIL DIVISION DIRECTOR

By: *<u>/s/ Margaret Paton Walsh</u>*
Margaret Paton Walsh
Laura Fox
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6612
Facsimile: (907) 269-3697
Email: margaret.paton-walsh@alaska.gov
laura.fox@alaska.gov

**Attorneys for Defendants**


<u>Certificate of Service</u>

I hereby certify that on October 29, 2026, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:26-cv-00376-SLG who are registered CM/ECF users will be served by the CM/ECF system.

*<u>/s/Margaret Paton Walsh</u>*
Margaret Paton Walsh, Chief Assistant Attorney General