STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-9500
Email: Stanley.Woodward@usdoj.gov

MICHAEL J. HEYMAN
United States Attorney

E. BRYAN WILSON
Assistant U.S. Attorney
U.S. Attorney's Office
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Email: Bryan.Wilson@usdoj.gov

*Attorneys for the Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

United States of America,

Plaintiff,

v.

State of Alaska; Carol Beecher, in her official capacity as Director of the Division of Elections of the State of Alaska; the Election Boards of the State of Alaska; and the State Ballot Counting Review Board of the State of Alaska,

Defendants,

and

Civ. No. 3:26-cv-00376-SLG

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNITED STATES' MOTION FOR EXPEDITED DISCOVERY AND PRELIMINARY INJUNCTION**

Alaskans for Mary, Democratic Senatorial Campaign Committee Risé Roy, Jan Jakub Grzeda, League of Women Voters of Alaska, and Common Cause,

Intervenor-Defendants.

## INTRODUCTION

## I. BACKGROUND

### A. The Sullivan Campaigns

On May 16, 2026, Senator Sullivan filed to run for reelection to the United States Senate. FAC ¶ 19. On May 29, 2026, Daniel J. Sullivan filed as a candidate for election to the Senate. FAC ¶ 20. Daniel J. Sullivan had never previously run for political office. FAC ¶ 22. Daniel J. Sullivan took several measures designed to confuse Alaska's voters into believing that he is Senator Sullivan, prompting complaints to the Alaska Division Board of Elections. FAC ¶ 23.

On June 15, the Alaska Division Elections ("the Division"), through Defendant Beecher, found that Daniel J. Sullivan's declaration of candidacy was not properly filed with the Division because it was not filed in order to declare a good-faith candidacy for the office of the United States Senator, but was instead filed with the purpose to confuse or mislead, and thereby compromise the ballot's fairness or neutrality. Ex. A., at 2. In that letter, the Division detailed several facts supporting its conclusion that Daniel J. Sullivan is running for Senate to deceive voters who intend to vote for Senator Sullivan into voting for him. Ex. A, at 1-2. Evidence supporting this conclusion included:

- Daniel J. Sullivan's request that the ballot display his name as "Dan Sullivan"—the same name used by Senator Sullivan, but his own voter registration was not under the name "Dan Sullivan." *Id.*

- Daniel J. Sullivan even requested that he be listed on the ballot as "Dan S. Sullivan"—even though "S" is not his middle (it's Senator Sullivan's). *Id.*

- According to the Division, Daniel J. Sullivan "requested to be designated on the ballot as affiliated with the Republican Party"—the same party as Senator Sullivan—but had never previously "been affiliated with the Republican Party in Alaska." His choice to "change [his] affiliation to the same political party … as the incumbent Senator … immediately before filing a declaration of candidacy in which [he] asked to access the ballot under the same name – in a shortened form [he'd] never used before - as the incumbent Senator strongly suggests an intent to confuse [him]self with the incumbent Senator rather than to distinguish [him]self from him."

- Although Daniel J. Sullivan decided to run as a Republican, he worked with a political consultant who is "a known longtime supporter of Democratic candidates including the primary Democratic challenger to Senator Sullivan." *Id.*

- Daniel J. Sullivan admitted in a July 18, 2026, interview with The New York Times that he voted for Democrats in the last three presidential elections and voted for Peltola when she ran for Congress. *Id.*

The Division described these ploys as "utterly unprecedented" and "unlike any previously presented to the Division."

Nevertheless, Daniel J. Sullivan sought judicial review of the Division's determination. FAC ¶ 26. A trial court held that the Division erred in excluding Daniel J. Sullivan. *Daniel J. Sullivan, Jr. v. Division of Elections*, No. 3AN-26-07485CI (Alaska Sup. Ct. June 26, 2026). The Alaska Supreme Court summarily affirmed and indicated that an "opinion will be issued at a later date." *Alaska v. Daniel J. Sullivan, Jr.*, No. S-19935 (Alaska June 29, 2026). The court has yet to issue that opinion. FAC. ¶ 26. As a result of its summary decision, Daniel J. Sullivan is on the ballot for the November 2026 election. FAC ¶ 28.

Despite Daniel J. Sullivan running as a Republican, the Democratic Senatorial Campaign Committee (DSCC) alongside the Peltola campaign celebrated the judicial

ruling, recognizing the confusion that inclusion of Daniel J. Sullivan would cause. As one DSCC employee wrote in an internal group chat: "Other Dan won, will be on ballot." Browning, *supra*.

The New York Times has reported additional details—namely, that Alaskans For Mary and the DSCC orchestrated his sham campaign for the purpose of misleading Alaskan voters and getting Peltola elected. As reported, "[o]peratives aligned with Mary Peltola, the Democratic nominee for Senate, spent months recruiting candidates to peel votes from Senator Dan Sullivan." Browning, *supra*. "[N]ot only did Ms. Peltola's team work with people trying to recruit Mr. Sullivan to run for Senate, but the effort was much broader. *Id.* The group worked to coax other would-be spoilers into the race, to dilute the incumbent's support and help catapult the Democrat to victory." *Id.*

The plot, "internally called the ballot composition project," "involved the Peltola campaign's lawyers, as well as senior aides at the Democratic Senatorial Campaign Committee." *Id*. A Democrat operative named Jerid Kurtz told the Peltola Campaign that Mr. Sullivan was "amenable to running if it would help Ms. Peltola" and further "said he hated Trump, and if it was going to help Mary, he liked Mary. He didn't have any interest in being a politician, but if this could help." *Id.* "Text messages viewed by The Times show officials with the D.S.C.C. and the Peltola campaign communicating for months about the project." *Id.* "The Peltola aides worried at times that Mr. Kurtz's efforts would be discovered." *Id.* "Throughout the spring, the campaign swapped leads with the DSCC on potential candidates and continued to participate in efforts to shape the ballot." *Id.* "In one exchange of text messages obtained by The Times, Peltola advisers seemed to make fun of voters while watching a focus group, surmising the participants would be susceptible to being tricked into voting for a ballot spoiler." *Id.*

"There were also efforts to support the new candidates financially. *Id.* Back in March, Peltola campaign employees had dinner with a local political consultant named Jim

Lottsfeldt. Mr. Lottsfeldt, who works with super PACs aligned with Ms. Peltola, agreed to lead an effort to boost the long-shot Senate candidates with outside spending." *Id.* This subversive "scheme" "involved the party's Senate committee and its top law firm"— the Elias Law Group (the firm representing Alaskans For Mary and the DSCC in this matter). *Id.*[4]

### B. Daniel J. Sullivan's Campaign Threatens to Mislead Alaska's Voters in the General Election

Alaska uses a two-step process for electing Senators. In the primary election, all candidates appear on the ballot, regardless of political party. With irrelevant exceptions, "only the four candidates who receive the greatest number of votes for any office shall advance to the general election." Alaska Statutes (A.S.) § 15.25.010. The general election is "conducted by ranked-choice voting." *Id.* § 15.15.350(c). Voters rank their candidates in order of preference and do not have to rank all candidates. "The election board shall initially tabulate each validly cast ballot as one vote for the highest-ranked continuing candidate on that ballot or as an inactive ballot. If a candidate is highest ranked on more than one-half of the active ballots, that candidate is elected and the tabulation is complete." *Id.* § 15.15.350(d). Otherwise, "votes cast for the defeated candidate shall cease counting for the defeated candidate and shall be added to the totals of each ballot's next-highest-ranked continuing candidate." *Id.* § 15.15.350(d)(2).

Consider a citizen who lists Candidate A as his first choice, Candidate B as his second choice, Candidate C as his third choice, and Candidate D as his fourth choice. If Candidate A receives the fewest first-place votes, then he is eliminated, and the citizen's vote is transferred to Candidate B. If Candidate B now has the most first-place votes, then that candidate wins the election. FAC ¶ 32.

---

[4] The Elias Law Group describes itself as "the nation's go-to law firm to fight back against . . . election subversion," with a "focus[] on . . . pro-democracy litigation" and "voting rights." https://elias.law/about/ (last visited Oct. 29, 2026).

Alaska held its primary election on August 28. Peltola received 49.5% of the vote, Senator Sullivan received 41.4%, Daniel J. Sullivan received 2.5%, and Republican Gerald Heikes received 1.1%. Those candidates are on the ballot in the November general election. FAC ¶ 33. As a result of Daniel J. Sullivan's inclusion, the ballot will contain both candidate Sullivans next to one another in a manner that will confuse voters looking to vote for Senator Sullivan, as demonstrated by a sample ballot:



State of Alaska Official Ballot
November 3, 2026
General Election

Federal Only

301

A candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or group or that the party or group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the political party or political group.

**Instructions:**

- Do not use red ink or a pencil to mark your ballot.
- Rank as many or few candidates as you like.
- Completely fill in no more than one oval for each candidate or column.
- For your 1st choice, fill in the oval in the first choice column.
- For your 2nd choice, fill in the oval in the 2nd choice column.
- For your 3rd choice, fill in the oval in the 3rd choice column, and so on.
- **If you make a mistake, you can ask for a new ballot.**

**United States Senator**

| | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| **Heikes, Gerald L.** (Registered Republican) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Peltola, Mary** (Registered Democrat) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Sullivan, Daniel J. Jr.** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Sullivan, Dan S.** (Registered Republican) Incumbent | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Write-in:** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |

**United States Representative**

| | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| **Begich, Nick** (Registered Republican) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Hafner, Eric** (Registered Democrat) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Hill, Bill** (Nonpartisan) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **McDermott, James C. "Jim"** (Registered Libertarian) | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |
| **Write-in:** | ○ 1 | ○ 2 | ○ 3 | ○ 4 | ○ 5 |

Daniel J. Sullivan's presence will mislead Alaskan citizens who want to vote for Senator Sullivan. FAC ¶ 36. Some supporters of Senator Sullivan likely will inadvertently

vote for Daniel J. Sullivan. Others likely will be confused as to how to rank the three Republican candidates as to defeat Peltola. They might not rank Senator Sullivan at all, resulting in votes for Daniel J. Sullivan to be transferred to Peltola after Daniel J. Sullivan's all-but-guaranteed elimination in the first or second round of tabulations. FAC ¶ 36. Many polls indicate that the race between Senator Sullivan and Peltola will be within one or two percentage points, and Daniel J. Sullivan received 2.5% of the vote in the primary election. FAC ¶ 37. Thus, there is a realistic chance that, even if a majority of Alaskans wish to vote for Senator Sullivan, Daniel J. Sullivan's presence on the ballot will result in a victory for Peltola. FAC ¶ 37.

## II. ARGUMENT

When deciding whether to allow expedited discovery under Federal Rule of Civil Procedure 26(d), courts employ "a more flexible good cause standard." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275 (N.D. Cal. 2002); *accord Rovio Entertainment Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1099 (N.D. Cal. 2012) (referring to this as the approach "[i]n the Ninth Circuit" and citing cases); *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1076 (S.D. Cal. 2019) (same). Good cause is found when "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Synopsys*, 401 F. Supp. 3d at 1076 (citation omitted). Relevant factors include: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Ibid.* However, trial courts are entitled to "wide discretion . . . in managing discovery." *Semitool*, 208 F.R.D. at 276 (citing *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir.1988)). If the moving party seeks expedition *ex parte*, that party bears the additional burden of showing that it will face irreparable harm if the court waits to rule on

its request by regular procedure. *Compstar Ins. v. Summit Specialty Ins.*, 2025 WL 4802470, at *1 (C.D. Calif. 2025).

When deciding whether to issue a preliminary injunction, courts consider whether the requesting party has shown "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Environmental Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). Under the Ninth Circuit's sliding-scale approach, where "a balance of hardships . . . tips sharply towards the plaintiff," a preliminary injunction is appropriate so long as there are "serious questions going to the merits," a "likelihood of irreparable injury" to the plaintiff, and "the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### A. Expedited Discovery is Essential to Ensure Alaskans Can Vote for Their Preferred Candidate

An order allowing expedited discovery is particularly important in cases, like this, where the United States is also bringing a motion for preliminary injunction to ensure the preservation and segregation of ballots that may be impacted by voter confusion. As the Supreme Court has recognized, "an important aspect of safeguarding the "integrity of [a state's] political processes" is keeping "frivolous . . . candidacies" from the ballot. *Bullock v. Carter*, 405 U.S. 134, 145 (1972). It has always been clear that Daniel J. Sullivan's campaign is "frivolous" and intended to confuse. The New York Times report further supports that (common sense) conclusion. As such, the United States more than satisfies the factors to establish good cause for expedited discovery.

1. *Whether a Preliminary Injunction is Pending.* As discussed in detail below, the United States seeks a preliminary injunction. That is one of the quintessential circumstances when expedited discovery "will be appropriate." Fed. R. Civ. P. 26, advisory committee notes to 1993 amendments; *see Apple, Inc. v. Samsung Electronics Co.*, 768 F. Supp. 2d 1040, 1044 (N.D. Cal. 2011) (noting that the court had granted expedited discovery in order to allow the plaintiff "to evaluate a preliminary injunction motion").

2. *Breadth of Discovery.* The United States' discovery requests are tailored to verify whether Daniel J. Sullivan's candidacy is "frivolous or fraudulent." The New York Times article details steps Alaskans for Mary and DSCC reportedly took to recruit not only Daniel J. Sullivan, but as many people as possible to run for office. The plan worked. Daniel J. Sullivan, despite enjoying retirement in a tiny fishing village and not having "any interest in being a politician," was willing to run for office as a Republican "if it was going to help Mary."[5] The United States' discovery requests specifically concern Alaskans for Mary's and the DSCC's efforts to recruit him. This information strikes at the core of the United States' claims.

3. *The Purpose of Expedited Discovery.* Expedited discovery is proper because early voting has already commenced. It is likely that voters looking to cast a vote for Senator Sullivan have been confused or misled by Daniel J. Sullivan's presence on the

---

[5] Browning, *supra*.

ballot. Election Day is this upcoming Tuesday, November 3, 2026. The timing is relevant to not only why a preliminary injunction should issue, but also why the United States should have the opportunity to discover the evidence necessary to substantiate its claims in support of that relief. Further, expedited discovery is essential to ensure that no evidence is altered, deleted, destroyed or otherwise lost considering the New York Times' recent reporting. *Cf. Synopsys*, 401 F. Supp. 3d at 1076 (denying a party's motion for expedited discovery because a litigation hold was in place which reduced the risk of spoilation).

4. *The Burden on Defendants and Timing.* Discovery will not prejudice Alaskans for Mary or DSCC, as this information is discoverable and will be disclosed in this litigation at some point. Nor should Alaskans for Mary or DSCC be surprised by the scope of the United States' discovery request. *See Semitool*, 208 F.R.D. at 277. Given that it was their goal to recruit as many sham candidates as possible to confuse voters, they cannot cry foul having specifically (and ironically) requested to intervene in this case "to defend against the Department of Justice's extraordinary assault" on our Nation's elections. ECF No. 5 at 1. The New York Times' reporting has revealed the lengths Alaskans for Mary and DSCC went to recruit Daniel J. Sullivan and their worry about getting caught. This Court should not aid in their efforts to undermine this election.

By contrast, the United States would be prejudiced by the delay of the production of these materials because it may inhibit the United States' ability to secure relief to protect Alaskans. *See United States v. Raines*, 362 U.S. 17, 27 (1960). In light of Alaskans for

Mary's and DSCC's "attack on free elections," it is vital that expedited discovery be granted. ECF No. 5 at 2.

### B. A Preliminary Injunction Should be Granted because Alaskan Voters will Suffer Irreparable Harm Due to an Illegitimate Election

#### ***1. The United States is Likely to Succeed on the Merits***

##### *a. The National Voter Registration Act*

In 1993, Congress enacted the National Voter Registration Act of 1993 (NVRA). Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. § 20501 *et seq.*). The "right of citizens of the United States to vote is a fundamental right," 52 U.S.C. § 20501(a)(1), and all governments—from local to state to federal—share a "duty . . . to promote the exercise of that right," *id.* § 20501(a)(2). The Attorney General has authority to "bring a civil action . . . for such declaratory or injunctive relief as is necessary to carry out" the statute. *Id.* § 20510(a). And one of the chief purposes of the NVRA is to "protect the integrity of the electoral process." *Id.* § 20501(b)(3).

The Supreme Court has recognized that the "integrity" of the electoral process depends in part on ensuring that only legitimate, bona fide candidates appear on the ballot. *Bullock*, 405 U.S. at 145. In *Bullock*, plaintiffs challenged a Texas law that mandated that applications for candidacy be accompanied by a filing fee. *Id.* at 135-36. Because plaintiffs were unable to pay the filing fee when they sought to declare their candidacy, they were "denied places on the Democratic primary ballots in their respective counties." *Id.*; *see id.* at 140-41 (explaining that primary elections constitute "state action"). Texas's "system create[d] barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose." *Id.* at 143. As the "very size of the fees imposed under the Texas system" was "patently exclusionary" and had a "real and appreciable impact on the exercise of the franchise," the Court "closely scrutinized" the

law to determine whether it was "reasonably necessary to the accomplishment of legitimate state objectives." *Id.* at 144.

Although the fee system failed that close scrutiny, the Court harbored no doubt about the legitimacy of the State's interest: the State had "an interest, if not a *duty*, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Id.* at 145 (emphasis added). In "regulating the number of candidates on the ballot," a State "understandably and *properly* seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." *Id.* at 145 (emphasis added). A contrary rule would require states to let ineligible candidates "clutter and confuse our electoral ballot." *Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014).

The Supreme Court repeated the importance of regulating candidates' access to the ballot in *Timmons v. Twin Cities Area New Party*, in upholding Minnesota's "antifusion law," which "prohibit[ed] a candidate from appearing on the ballot as the candidate of more than one party." 520 U.S. 351, 354 (1997). "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358. They "certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Id.* at 364 (citing *Bullock*, 405 U.S. at 145); *see also id.* at 369-70 (highlighting the State's "interest[] in ballot integrity"). That meant an interest in preventing candidates from "exploit[ing] fusion as a way of associating [one's] name with popular slogans and catchphrases." *Id.* at 365.

Given the well-recognized need for a state to protect the integrity of its elections by regulating access to the ballot, the Supreme Court "ha[s] never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot

access." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986); *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983) (citing laws restricting access to the ballot that have been upheld on similar rationales). The Court has also recognized States' "right to prevent distortion of the electoral process" in various ways, such as by prohibiting "party raiding" ("the organized switching of blocks of voters from one party to another" in order to "manipulate" the other side's primaries). *Anderson*, 460 U.S. at 788 n.9.

Alaska cannot neglect its obligation to "protect the integrity of [its] electoral process," 52 U.S.C. § 20501(b)(3), by ensuring that "frivolous . . . candidacies" do not "clog[] its election machinery[]" and cause "voter confusion," *Bullock*, 405 U.S. at 145. While states need no "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access," *Munro*, 479 U.S. at 194–95, this case involves just such a showing. Defendant Beecher found likely voter confusion and a frivolous candidacy. Ex. A, at 1-2. Based on a wide array of "unique, and to [her] knowledge utterly unprecedented facts," she was "forced to conclude that [Daniel J. Sullivan's] declaration of candidacy . . . was not filed in good faith for the purpose of genuinely pursuing election as Alaska's U.S. Senator," but rather "with the purpose of confusing or misleading the electorate and compromising the fairness of the ballot." *Id.* at 2. The recent reporting by the New York Times adds to the United States' likelihood of success on the merits by showing that an independent investigation revealed that Defendant Beecher's conclusion was correct—indeed, that the scheme was not only intended to confuse, but also organized by Senator Sullivan's main opponent.

The State itself views Daniel J. Sullivan's candidacy as "frivolous." *Bullock*, 405 U.S. at 145. Daniel J. Sullivan does not seek to serve in the U.S. Senate but rather seeks to confuse voters. Ex. A at 2. He "chose [his] new nickname and party affiliation because that name and party affiliation happen to be the name and party affiliation of another candidate

in the race." *Id.* His campaign strategy has attempted to capitalize on his name and adopt various aspects of Senator Sullivan's campaign so as to "associat[e]" himself with "popular" imagery that voters believe belongs to Senator Sullivan. *See Timmons*, 520 U.S. at 365; FAC. ¶¶ 23-24.

A candidacy pursued for these reasons, "[l]ack[s] in high purpose" and is properly considered "frivolous." *Frivolous*, def. 1, *Black's Law Dictionary* (12th ed. 2024) ("[l]acking in high purpose; trifling, trivial, and silly"); *id.*, def. 2 ("[l]acking a legal basis or legal merit; manifestly insufficient as a matter of law"); *see Lindsay*, 750 F.3d at 1064 (involving a would-be candidate who did not satisfy prerequisites to serve in office). The State has a legally enforceable duty under the NVRA to protect the integrity of its election, 52 U.S.C. § 20501(b)(3), and preventing Daniel J. Sullivan's frivolous candidacy from distorting the result of the upcoming election is a necessary part of doing so, *Bullock*, 405 U.S. at 145.

It makes no difference that, unlike in *Bullock*, the United States seeks preservation and segregation of ballots, as opposed to the inclusion of a candidate's name on the ballot. The Supreme Court of Alaska has already ruled that Daniel J. Sullivan's name must be included on the ballot. FAC. ¶ 28. Accordingly, there will indeed be voter confusion caused by this frivolous candidacy. FAC ¶ 49. But the logic of *Bullock* and its progeny does not stop once the ballots are printed and handed out. The State's interest is in maintaining the "integrity of its political processes," not just its ballots. 405 U.S. at 145; *see Timmons*, 520 U.S. at 364 ("protecting the integrity, fairness, and efficiency of their ballots *and election processes*" (emphasis added)); *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 681 (2026); A.S. §§ 15.15.360-15.15.450. Ignoring the State's duty to protect its election machinery just because ballots have been printed would ignore a key aspect of the state interest recognized in *Bullock*: to "assure that the winner is the choice of a majority, or at least a strong plurality, of those voting." 450 U.S. at 145.

*b. Obstacle Preemption*

For the same reasons, the NVRA would preempt Alaska's refusal to preserve and segregate potentially tainted ballots pending an investigation.

Under the Supremacy Clause, the "Constitution, and the Laws of the United Sates which shall be made in pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl.2. "Congress may implicitly pre-empt a state law, rule, or other state action." *Oneok, In. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015) (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)). "Although preemption often applies to state statutes, preemption can also invalidate actions of state executive branch officials . . . that conflict with federal law." *Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992); *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 357 (1988)). State law or action that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress" is preempted. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *accord ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968-69 (9th Cir. 2026).

The NVRA imposes a variety of duties on States for the purpose of "protect[ing] the integrity of the electoral process." 52 U.S.C. § 20501(b)(3); *see id.* §§ 20503-20509. Defendants' actions described above thus thwart "the accomplishment and execution" of federal law. *ConocoPhillips*, 177 F.4th at 968-99. Defendants are aware that Daniel J. Sullivan's inclusion on the ballot is the result of a conspiracy to undermine the integrity of the electoral process. Turning a blind eye to this scheme and refusing to even preserve and segregate ballots that may be impacted would frustrate Congress's objectives in seeking to protect the integrity of the electoral process.

***2. Absent Precautionary Measures, the United States Will Suffer Irreparable Harm***

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The right to vote encompasses "[t]he right to vote freely for the candidate of one's choice," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), and any "restriction on the fundamental right to vote … constitutes irreparable injury." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Monetary damages cannot compensate Alaskans duped into voting for Daniel J. Sullivan. *See, e.g., League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Arizona Democratic Party v. Arizona Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016) ("[I]f some potential voters are improperly dissuaded from exercising their franchise … no amount of traditional remedies such as money damages would suffice after the fact.").

This injury to Alaska voters satisfies the irreparable-harm standard. When voters are unable to fairly cast ballots in federal elections, the United States suffers irreparable harm. *See United States v. Town of Thornapple*, 143 F.4th 793, 799-800 (7th Cir. 2025) (affirming injunction preventing a town from "depriv[ing] individuals with disabilities of the *opportunity* to vote") (quotation marks omitted). And because an election, once carried out, cannot be undone, *see League of Women Voters of N.C. v*, 769 F.3d at 247, the United States likewise suffers irreparable harm when a State flouts federal law in the conduct of its election laws. *See also United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012).

### *3. The Balance of Equities and the Public Interest Favor an Injunction*

"When, like here, the nonmovant is the government," the balance of equities and public interest "merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citation omitted). "[I]t would not be equitable or in the public's interest to allow the state to violate the requirements of federal law[.]" *Arizona Dream Act Coal.*, 757 F.3d at 1069 (cleaned up).

"[T]he people of the United States ... have an interest in and a right to honest and fair elections," *United States v. Gradwell,* 243 U.S. 476, 480 (1917), and a "strong interest in exercising the fundamental political right to vote," *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (quotation marks omitted). "That interest is best served by . . . ensuring that qualified voters' exercise of their right to vote is successful," *i.e.*, free from deception and confusion. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). Daniel J. Sullivan's presence on the ballot undermines the "background of fairness" and harms "the deep public interest in honest and fair elections." *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012).

*Purcell* does not prohibit preliminary relief. *Purcell* "reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–881 (2022) (Kavanaugh, J., concurring in grant of applications for stays). That is because "[c]ourt orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5. But the requested relief here would not change the rules of the election. It would merely require preservation and segregation of potentially tainted ballots, and only if the result may have been impacted by the scheme to confuse voters, pending an investigation. FAC ¶ 50.

Defendants will suffer no prejudice from that limited relief. Alaska's election officials have an independent obligation to "retain and preserve" all ballots cast in this election until 2028. 52 U.S.C. § 20701. The Civil Rights Act of 1960 requires "[e]very officer of election" to "retain and preserve, for a period of twenty-two months from the date of any general . . . election of which candidates for the office of . . . Member of the Senate . . . are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." *Id.* That retention-and-preservation requirement "encompasses, among other

things, . . . the ballots themselves." *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (citing 52 U.S.C. § 20701 (formerly 42 U.S.C. § 1974)); *see O'Neil v. Hosemann*, No. 3:18-cv-815, 2018 WL 6188292, at *4 (S.D. Miss. Nov. 27, 2018) (noting that absentee ballots are "maintained for 22 months" under 52 U.S.C. § 20701). The segregation of ballots ranking Daniel J. Sullivan constitutes a negligible further burden on Defendants.

***

The United States has satisfied the *Winter* factors. And under the Ninth Circuit's sliding-scale approach, there are at least "serious questions going to the merits" of the United States' claim, which is enough to justify a preliminary injunction given the lopsided showing the United States has made on the remaining factors. *Alliance for the Wild Rockies*, 632 F.3d at 1134-35.

## CONCLUSION

The Court should grant the United States' motion for expedited discovery and a preliminary injunction.

Dated: October 30, 2026

Respectfully submitted,

/s/ Stanley Woodward
Stanley E. Woodward, Jr.
*Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-9500
Email: Stanley.Woodward@usdoj.gov

MICHAEL J. HEYMAN
United States Attorney

/s/ E. Bryan Wilson
E. Bryan Wilson
Assistant U.S. Attorney
U.S. Attorney's Office
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
Email: Bryan.Wilson@usdoj.gov

**Certificate of Service**

I hereby certify that on October 30, 2026, a true and correct copy of the foregoing document was served electronically through the CM/ECF system upon all case participants who are registered CM/ECF users.

/s/ E. Bryan Wilson
Office of the U.S. Attorney

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States of America certifies that this brief contains 5,130 words, which complies with Local Rule 7.4(a).

Dated: October 30, 2026