STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-9500
Email: Stanley.Woodward@usdoj.gov

MICHAEL J. HEYMAN
United States Attorney

E. BRYAN WILSON
Assistant U.S. Attorney
U.S. Attorney's Office
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Email: Bryan.Wilson@usdoj.gov

Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT

FOR THE FOR THE DISTRICT OF ALASKA

United States of America,

Plaintiff,

v.

State of Alaska; Carol Beecher, in her official capacity as Director of the Division of Elections of the State of Alaska; the Election Boards of the State of Alaska; and the State Ballot Counting Review Board of the State of Alaska,

Defendants,

and

Civ. No. 3:26-cv-00376-SLG

**PLAINTIFF'S OMNIBUS OPPOSITION TO MOTIONS TO DISMISS**

Alaskans for Mary, Democratic Senatorial Campaign Committee Risé Roy, Jan Jakub Grzeda, League of Women Voters of Alaska, and Common Cause,

Intervenor-Defendants.

## INTRODUCTION

According to reporting this week from the New York Times, the Mary Peltola Campaign and the Democratic Senatorial Campaign Committee (DSCC) have carried out a conspiracy to recruit and prop up a sham candidate to mislead Alaskan voters. Campaign staffers mocked voters who they expected to be tricked. Tellingly, in their motion, the Peltola Campaign and the DSCC acknowledge the report that they have orchestrated this fraudulent campaign—and they do not deny any aspect of it. Defendants and Intervenors nevertheless argue the United States and this Court are powerless to do anything to protect Alaskans in these circumstances. They are wrong, and the Court should deny their motions to dismiss.

## BACKGROUND

### A. Factual Background

<u>The Peltola Campaign's Scheme to Mislead Alaska Voters</u>

According to New York Times reporting, as part of what was internally called the "Ballot Composition Project," the Peltola Campaign conspired with the DSCC and other operatives to recruit another candidate named Dan Sullivan to confuse voters and pull

support from incumbent Senator Sullivan. FAC ¶¶ 1-2.[1] The reported plan seemingly worked, and Daniel J. Sullivan decided to run for Senator in 2026 as a Republican with the intention of misleading supporters of Senator Sullivan into voting for him. *Id.* ¶ 3. The sole purpose of his candidacy is to benefit the Peltola campaign by reducing the number of votes for Senator Sullivan. *Id.*

Daniel J. Sullivan took several measures designed to confuse Alaska's voters into believing that he is Senator Sullivan, prompting complaints to the Alaska Division Board of Elections. *Id.* ¶ 23.

On June 15, the Alaska Division Elections ("the Division"), through Defendant Beecher, found that Daniel J. Sullivan's declaration of candidacy was "not properly filed with the Division because it was not filed in order to declare an actual good-faith candidacy for the office of the United States Senator, but was instead filed with the purpose to confuse or mislead, and thereby compromise the ballot's fairness or neutrality." FAC Ex. A., at 2. In that letter, the Division detailed several facts supporting its conclusion that Daniel J. Sullivan is running for Senate to deceive voters who intend to vote for Senator Sullivan into voting for him. Evidence supporting this conclusion included:

---

[1] Browning, *Inside Democrats' Secret Effort to Stack Alaska's Ballot*, N.Y TIMES (Oct. 28, 2026), https://www.nytimes.com/2026/10/28/us/politics/alaska-dan-sullivan-conspiracy-peltola.html.

- Daniel J. Sullivan's request that the ballot display his name as "Dan Sullivan"—the same name used by Senator Sullivan, but his own voter registration was not under the name "Dan Sullivan." *Id.*
- Daniel J. Sullivan even requested that he be listed on the ballot as "Dan S. Sullivan"—even though "S" is not his middle (it's Senator Sullivan's). *Id.*
- According to the Division, Daniel J. Sullivan "requested to be designated on the ballot as affiliated with the Republican Party"—the same party as Senator Sullivan—but had never previously "been affiliated with the Republican Party in Alaska." His choice to "change [his] affiliation to the same political party … as the incumbent Senator … immediately before filing a declaration of candidacy in which [he] asked to access the ballot under the same name – in a shortened form [he'd] never used before - as the incumbent Senator strongly suggests an intent to confuse [him]self with the incumbent Senator rather than to distinguish [him]self from him." *Id.*
- Although Daniel J. Sullivan decided to run as a Republican, he worked with a political consultant who is "a known longtime supporter of Democratic candidates including the primary Democratic challenger to Senator Sullivan." *Id.*
- Daniel J. Sullivan admitted in a July 18, 2026, interview with The New York Times that he voted for Democrats in the last three presidential elections and voted for Peltola when she ran for Congress. *Id.*

The Division described these ploys as "utterly unprecedented" and "unlike any previously presented to the Division." *Id.*

Nevertheless, Mr. Sullivan sought judicial review of the Division's determination. FAC ¶ 26. A trial court held that the Division erred in excluding Daniel J. Sullivan from the ballot. *Daniel J. Sullivan, Jr. v. Division of Elections*, No. 3AN-26-07485CI (Alaska Sup. Ct. June 26, 2026). The Alaska Supreme Court summarily affirmed and indicated that a "full opinion will be issued at a later date." *Alaska v. Daniel J. Sullivan, Jr.*, No. S-19935 (Alaska June 29, 2026). The Alaska Supreme Court has yet to issue that opinion. FAC ¶ 26. As a result of the Alaska Supreme Court's summary decision, Daniel J. Sullivan will be included on Alaska's ballot for the November 2026 general election. *Id.* ¶ 28.

Despite Daniel J. Sullivan running as a Republican, the DSCC alongside the Peltola campaign celebrated the judicial ruling, recognizing the confusion that inclusion of Daniel J. Sullivan would cause. Browning, *supra.*

The New York Times has reported additional details—namely, that the Peltola campaign and the DSCC orchestrated his sham campaign for the purpose of misleading Alaskan voters and getting Peltola elected. As reported, "[o]peratives aligned with Mary Peltola, the Democratic nominee for Senate, spent months recruiting candidates to peel votes from Senator Dan Sullivan." Browning, *supra*. "[B]ased on interviews and text messages, along with documents prepared for a potential lawsuit against the campaign, . . . not only did Ms. Peltola's team work with people trying to recruit Mr. Sullivan to run for Senate, but the effort was much broader. *Id.* The group worked to coax other would-be

spoilers into the race, to dilute the incumbent's support and help catapult the Democrat to victory." *Id.*

The plot, "internally called the ballot composition project," "involved the Peltola campaign's lawyers, as well as senior aides at the Democratic Senatorial Campaign Committee." *Id.* A Democrat operative named Jerid Kurtz told the Peltola Campaign that Mr. Sullivan was "amenable to running if it would help Ms. Peltola" and further "said he hated Trump, and if it was going to help Mary, he liked Mary. He didn't have any interest in being a politician, but if this could help." *Id.* "Text messages viewed by The Times show officials with the DSCC and the Peltola campaign communicating for months about the project." *Id.* "The Peltola aides worried at times that Mr. Kurtz's efforts would be discovered." *Id.* "Throughout the spring, the campaign swapped leads with the DSCC on potential candidates and continued to participate in efforts to shape the ballot." *Id.* "In one exchange of text messages obtained by The Times, Peltola advisers seemed to make fun of voters while watching a focus group, surmising the participants would be susceptible to being tricked into voting for a ballot spoiler." *Id.* Peltola operatives described these efforts as their "scheme" and their "ballot strategy plan." *Id.*

"There were also efforts to support the new candidates financially. *Id.* Back in March, Peltola campaign employees had dinner with a local political consultant named Jim Lottsfeldt. Mr. Lottsfeldt, who works with super PACs aligned with Ms. Peltola, agreed to lead an effort to boost the long-shot Senate candidates with outside spending." *Id.* This subversive "scheme" "involved the party's Senate committee and its top law firm"— the

Elias Law Group (the firm representing Alaskans For Mary and the DSCC in this matter). *Id.*[2]

Following the Times's reporting, Alaska Governor Mike Dunleavy announced on X that he is "directing the Department of Public Safety to investigate whether this scheme violated Alaska's laws and whether criminal charges or civil action are warranted."[3]

Daniel J. Sullivan's Campaign Threatens to Mislead Alaska's Voters

Alaska's general election is "conducted by ranked-choice voting." *Id.* § 15.15.350(c). Voters rank their candidates in order of preference and do not have to rank all candidates. "The election board shall initially tabulate each validly cast ballot as one vote for the highest-ranked continuing candidate on that ballot or as an inactive ballot. If a candidate is highest ranked on more than one-half of the active ballots, that candidate is elected and the tabulation is complete." *Id.* § 15.15.350(d). Otherwise, "votes cast for the defeated candidate shall cease counting for the defeated candidate and shall be added to the totals of each ballot's next-highest-ranked continuing candidate." *Id.* § 15.15.350(d)(2).

To illustrate, consider a citizen who lists Candidate A as his first choice, Candidate B as his second choice, Candidate C as his third choice, and Candidate D as his fourth choice. If Candidate A receives the fewest first-place votes, then he is eliminated, and the

[2] The Elias Law Group describes itself as "the nation's go-to law firm to fight back against . . . election subversion," with a "focus[] on . . . pro-democracy litigation" and "voting rights." https://elias.law/about/ (last visited Oct. 29, 2026).

[3] Governor Mike Dunleavy (@GovDunleavy), X (October 29, 2026), https://x.com/GovDunleavy/status/2115669883149222169.

citizen's vote is transferred to Candidate B. If Candidate B now has the most first-place votes, then that candidate wins the election. FAC ¶ 32.

Alaska held its primary election on August 28. Peltola received 49.5% of the vote, Senator Sullivan received 41.4% of the vote, Daniel J. Sullivan received 2.5% of the vote, and Republican Gerald Heikes received 1.1% of the vote. Those candidates will be on the ballot in the November general election. FAC ¶ 33. As a result of Daniel J. Sullivan's inclusion on the November ballot, the ballot will contain both candidate Sullivans next to one another in a manner that will confuse voters looking to vote for Senator Sullivan. FAC ¶ 34 (sample ballot).

Daniel J. Sullivan's presence on the ballot threatens to mislead Alaskan citizens who want to vote for Senator Sullivan. FAC ¶ 36. For example, some supporters of Senator Sullivan likely will inadvertently vote for Daniel J. Sullivan. Other supporters of Senator Sullivan likely will be confused as to how to rank the three Republican candidates as to defeat Peltola. They might not rank Senator Sullivan at all (while thinking they already have), resulting in votes for Daniel J. Sullivan to be transferred to Peltola after Daniel J. Sullivan's all-but-guaranteed elimination in the first or second round of tabulations. *Id.* Many polls indicate that the race between Senator Sullivan and Peltola will be within one or two percentage points, and Daniel J. Sullivan received 2.5% of the vote in the primary election. FAC ¶ 35. Thus, there is a realistic chance that, even if a majority of Alaskans wish to vote for Senator Sullivan, Daniel J. Sullivan's presence on the ballot will mislead voters and result in a victory for Peltola. FAC ¶ 37.

### B. Procedural History

On October 22, 2026, the United States sued under the NVRA to protect the integrity of this federal election. ECF No. 1. Over the next three days, Alaskans For Mary, the Democratic Senatorial Campaign Committee, the League of Women Voters, Common Cause, Jan Jakub Grzeda, and Ris Roy moved to intervene and dismiss on an expedited schedule. ECF Nos. 5-9. On October 26, the State Defendants moved to dismiss on an expedited schedule. ECF Nos. 16-18. And by October 28, the Court had granted the motions to intervene and set an expedited briefing schedule on all three motions to dismiss. ECF Nos. 19, 35. That same day, the New York Times reported that the Peltola Campaign and the DSCC had actively recruited and propped up Daniel J. Sullivan in an effort to confuse voters. Browning, *supra.* The next day, the United States filed an amended complaint including new allegations based on the New York Times reporting and a new obstacle preemption claim. ECF No. 43; *see also United States v. California*, No. 26-7070, 2026 WL 3212945, at *26-31 (9th Cir. Oct. 26, 2026) (Bumatay, J., dissenting).[4] Defendants and Intervenors filed renewed motions to dismiss and requested an expedited schedule. ECF Nos. 53-55, 57, 59-61. On October 30, 2026, at 7:37 AM ADT, the Court ordered that the United States file any opposition by 1:00 PM ADT. ECF No. 64.

---

[4] The State Defendants have accused the United States of "gamesmanship" for amending the complaint. But given the significance of the New York Times report and other events following the filing of the original complaint, it would have been odd for the United States *not* to amend.

## LEGAL STANDARD

A motion to dismiss must be denied if, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party," the complaint "plausibly suggest[s] an entitlement to relief." *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883, 886-87 (9th Cir. 2017) (quotation marks omitted).

## ARGUMENT

### I. **The United States Has Standing to Bring These Claims**

Only the State Defendants challenge the United States' standing. Their argument fails. The United States has a substantial and legally cognizable interest in maintaining the integrity of elections. *See* 52 U.S.C. §§ 20501(b)(3), 20510(a). The United States suffers an injury in fact whenever federal law is violated, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), including when remedying such a violation is necessary to safeguard the sacred right of its citizens to vote, *see United States v. Raines*, 362 U.S. 17, 27 (1960). Indeed, "[t]he due and fair election of [congressional] representatives is of vital importance to the United States." *Ex parte Siebold*, 100 U.S. 371, 388 (1879).

An election impacted by voter confusion harms the United States because it "undermine[s] the integrity of the electoral process"—"a process of the most fundamental [constitutional] significance." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77–78 (2026) (citations omitted). The Federal Government "suffer[s] when the process departs from the

law" because citizens will question whether the results truly "reflect the will of the people." *Id.* "[T]hat loss of legitimacy—or its diminution—is a concrete harm." *Id.*

The State's contrary arguments confuse standing with the merits. *See* ECF No. 55 p. 18 ("Even assuming it suffers an injury in fact whenever federal law is violated, the complaint does not allege a violation of any federal law.") (citations omitted). As the Supreme Court has explained, "standing in no way depends on the merits of the plaintiff's" claim, *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and "the absence of a valid (as opposed to arguable) cause of action does not implicate" standing, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

To defeat standing, the State must show that, *assuming* the United States is correct that Defendants are violating the NVRA, then the United States will suffer no injury. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). They cannot; because as the United States has plausibly alleged, an election impacted by voter confusion will reflect an electoral process that lacked integrity. FAC ¶ 49. And that loss of election integrity and legitimacy is a concrete harm. *Bost*, 607 U.S. at 77–78.

That injury is also "fairly traceable" to Defendants' actions and "likely to be redressed" by a favorable decision by this Court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendants can take measures, including but not limited to the segregation of

ballots, to ensure the integrity of Alaska's elections results, and this Court can order them to do so. The United States thus has standing to bring this suit.[5]

## II. <u>The United States Has Stated Valid Claims</u>

The Motions to Dismiss characterize Mr. Sullivan as a good-faith actor seeking to serve the people of Alaska. He isn't. Recent reports suggest he is not only a sham candidate (as has been obvious all along), but also on the cusp of helping the Peltola campaign perpetrate egregious electoral fraud. Allowing this scheme to succeed unabated would be antithetical to the NVRA.

### A. <u>The National Voter Registration Act</u>

In 1993, Congress enacted the National Voter Registration Act of 1993 (NVRA). Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. § 20501 *et seq.*). It states that the "right of citizens of the United States to vote is a fundamental right," 52 U.S.C. § 20501(a)(1), and that the local, state, and federal governments of the United States share a "duty . . . to promote the exercise of that right," *id.* § 20501(a)(2). The Attorney General has authority to "bring a civil action . . . for such declaratory or injunctive relief as is necessary to carry out" the statute. *Id.* § 20510(a). And one of the chief purposes of the NVRA is to "protect the integrity of the electoral process." *Id.* § 20501(b)(3).

[5] There is no ripeness problem because the United States does not need to wait until the process of tabulating and certifying votes has actually occurred (at which point Defendants would presumably say the United States waited too late). As a practical matter, it may be critical for state officials to take precautionary measures now to help ensure any voter confusion can be addressed later.

For more than half-a-century, the Supreme Court of the United States has recognized that the "integrity" of the electoral process depends in part on ensuring that only legitimate, bona fide candidates appear on the ballot. *Bullock*, 405 U.S. at 145. In *Bullock*, plaintiffs challenged a Texas law that mandated that applications for candidacy be accompanied by a filing fee. *Id.* at 135-36. Because plaintiffs were unable to pay the necessary filing fee when they sought to declare their candidacy, they were "denied places on the Democratic primary ballots in their respective counties." *Id.*; *see id.* at 140-41 (explaining that primary elections constitute "state action"). Texas's "system create[d] barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose." *Id.* at 143. As the "very size of the fees imposed under the Texas system" was "patently exclusionary" and had a "real and appreciable impact on the exercise of the franchise," the Court "closely scrutinized" the law to determine whether it was "reasonably necessary to the accomplishment of legitimate state objectives." *Id.* at 144.

Although the fee system failed that close scrutiny, the Court harbored no doubt about the legitimacy of the State's interest: the State had "an interest, if not a *duty*, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Id.* at 145 (emphasis added). In "regulating the number of candidates on the ballot," a State "understandably and *properly* seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." *Id.* at 145

(emphasis added). A contrary rule would require states to let ineligible candidates "clutter and confuse our electoral ballot." *Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014).

The Supreme Court repeated the importance of regulating candidates' access to the ballot in *Timmons v. Twin Cities Area New Party*, in upholding Minnesota's "antifusion law," which "prohibit[ed] a candidate from appearing on the ballot as the candidate of more than one party." 520 U.S. 351, 354 (1997). The Court explained that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358. They "certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Id.* at 364 (citing *Bullock*, 405 U.S. at 145); *see also id.* at 369-70 (highlighting the State's "interest[] in ballot integrity"). And that meant an interest in preventing candidates from "exploit[ing] fusion as a way of associating [one's] name with popular slogans and catchphrases." *Id.* at 365.

Given the well-recognized need for a state to protect the integrity of its elections by regulating access to the ballot, the Supreme Court "ha[s] never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986); *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983) (citing laws restricting access to the ballot that have been upheld on similar rationales). The Court has also recognized States' "right to prevent distortion of the electoral process" in various ways, such as by prohibiting

"party raiding" ("the organized switching of blocks of voters from one party to another" in order to "manipulate" the other side's primaries). *Anderson*, 460 U.S. at 788 n.9.

Alaska cannot neglect its obligation, codified in the NVRA, to "protect the integrity of [its] electoral process," 52 U.S.C. § 20501(b)(3), by ensuring that "frivolous . . . candidacies" do not "clog[] its election machinery[]" and cause "voter confusion," *Bullock*, 405 U.S. at 145. While states need no "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access," *Munro*, 479 U.S. at 194–95, this case involves just such a showing. Defendant Beecher herself found likely voter confusion and a frivolous candidacy. Ex. A, at 1-2. Based on a wide array of "unique, and to [her] knowledge utterly unprecedented facts," she was "forced to conclude that [Daniel J. Sullivan's] declaration of candidacy . . . was not filed in good faith for the purpose of genuinely pursuing election as Alaska's U.S. Senator," but rather "with the purpose of confusing or misleading the electorate and compromising the fairness of the ballot." *Id.* at 2. The recent reporting by the New York Times revealed that Defendant Beecher's conclusion was correct—indeed, that the scheme was not only intended to confuse, but also organized by the Peltola Campaign and the DSCC.

Defendant Beecher's conclusion, which she reached in her official role as the head of the Division of Elections, leaves no doubt that the State views Daniel J. Sullivan's candidacy as "frivolous." *Bullock*, 405 U.S. at 145. Daniel J. Sullivan does not seek election to actually serve in the U.S. Senate but rather seeks to confuse voters. Ex. A at 2.

He "chose [his] new nickname and party affiliation because that name and party affiliation happen to be the name and party affiliation of another candidate in the race." *Id.* His campaign strategy has attempted to capitalize on his name and adopt various aspects of Senator Sullivan's campaign so as to "associat[e]" himself with "popular" imagery that voters believe belongs to Senator Sullivan. *See Timmons*, 520 U.S. at 365; FAC ¶¶ 23-24.

A candidacy pursued for these reasons, "[l]ack[s] in high purpose" and is properly considered "frivolous." *Frivolous*, def. 1, *Black's Law Dictionary* (12th ed. 2024) ("[l]acking in high purpose; trifling, trivial, and silly"); *id.*, def. 2 ("[l]acking a legal basis or legal merit; manifestly insufficient as a matter of law"); *see Lindsay*, 750 F.3d at 1064 (involving a would-be candidate who did not satisfy prerequisites to serve in office). The State has a legally enforceable duty under the NVRA to protect the integrity of its election, 52 U.S.C. § 20501(b)(3), and preventing Daniel J. Sullivan's frivolous candidacy from distorting the result of the upcoming election is a necessary part of doing so, *Bullock*, 405 U.S. at 145.

It makes no difference that, unlike in *Bullock*, the United States does not seek the inclusion of a candidate's name on the ballot. The Supreme Court of Alaska has already ruled that Daniel J. Sullivan's name must be included on the November ballot. Accordingly, there will indeed be voter confusion caused by this frivolous candidacy during the November election. FAC ¶¶ 34-37. But the logic of *Bullock* and its progeny does not stop once the ballots are printed and handed out. The State's interest is in maintaining the "integrity of its political processes," not just its ballots. 405 U.S. at 145;

*see Timmons*, 520 U.S. at 364 ("protecting the integrity, fairness, and efficiency of their ballots *and election processes*" (emphasis added)). The ballot represents one important step in the political process, but not the final one. *See Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 681 (2026); A.S. §§ 15.15.360-15.15.450. Ignoring the State's duty to protect its election machinery just because ballots have been printed would ignore a key aspect of the state interest recognized in *Bullock*: to "assure that the winner is the choice of a majority, or at least a strong plurality, of those voting." 450 U.S. at 145.

Intervenor-Defendants' contention that the Amended Complaint "does not allege facts plausibly showing voter confusion" is beyond the pale. ECF No. 57 pp. 20-24. It is common sense that a sham candidate on the ballot with the same name as the incumbent might confuse voters. After all, that's why the Peltola Campaign and the DSCC reportedly concocted this scheme in the first place: because they know it will mislead voters and help Peltola. In any event, the Amended Complaint details the specific steps Mr. Sullivan took to dupe voters. FAC ¶¶ 23-24, 34-36. And Defendant Beecher already concluded Mr. Sullivan is running for the purpose of misleading voters. Finally, there is nothing insulting to Alaskan voters about trying to protect them from confusion. What's insulting is trying to confuse them in the first place.

B. <u>Obstacle Preemption</u>

For the same reasons, the NVRA preempts the State Defendants' conduct arising from Daniel J. Sullivan's frivolous candidacy.

Under the Supremacy Clause, the "Constitution, and the Laws of the United Sates which shall be made in pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl.2. "Congress may implicitly pre-empt a state law, rule, or other state action." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015) (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)). "Although preemption often applies to state statutes, preemption can also invalidate actions of state executive branch officials . . . that conflict with federal law." *Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992); *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 356-57 (1988)). State law or action that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress" is preempted. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000); *accord ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968-69 (9th Cir. 2026).

Here, the NVRA imposes a variety of duties on States for the purpose of "protect[ing] the integrity of the electoral process." 52 U.S.C. § 20501(b)(3); *see id.* §§ 20503-20509. Defendants' actions thwart "the accomplishment and execution" of federal law. *ConocoPhillips*, 177 F.4th at 968-99. Defendants are aware that Daniel J. Sullivan's inclusion on the ballot is the result of a conspiracy to undermine the integrity of the electoral process. Turning a blind eye to this scheme would frustrate Congress's objectives in seeking to protect the integrity of the electoral process.

Arguing otherwise, Defendants repeatedly characterize the NVRA as a "voter registration law." But "Congress was well aware of the problem of voter fraud when it passed the act and provided for numerous fraud protections in the NVRA." *Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012); *see id.* n.28 (highlighting the NVRA's requirement that the Federal Form, the State Forms, and the Motor Voter Forms contain an attestation clause that sets out the requirements for voter eligibility; Applicants are required to sign these forms under penalty of perjury; and persons who knowingly and willfully engage in fraudulent registration practices are subject to criminal penalties).

The overarching purpose of these voter fraud protections is to "protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). As Director Beecher has already found, Mr. Sullivan is unquestionably undermining the integrity of Alaska's election. The United States has thus stated a claim that Defendants' conduct is preempted by the NVRA.[6]

## III. The United States Seeks Proper, Tailored Relief

Defendants also take issue with the relief sought in the Amended Complaint. But none of these arguments are grounds for dismissal. The Court can fashion whatever relief it "deems just and proper." FAC ¶ 58. And the only immediate relief the United States has sought is the preservation and segregation of relevant ballots. Defendants' qualms with

---

[6] For the same reasons, the Court should ignore Intervenor-Defendants' reference to sanctions, which should not distract from their own apparent misrepresentations to the Court if the New York Times reporting is accurate. *Compare* ECF No. 5-1 ¶ 22, *with* Browning, *supra*.

the mechanics for effectuating all the relief referenced in the Amended Complaint is irrelevant at the motion to dismiss stage.

Along the same lines, the State is wrong that there is an Elections Clause violation. The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. Art. I, § 4, cl. 1. The United States is not seeking to alter the time, place, or manner of Alaska's election. And as Defendants concede, the Constitution grants States the authority to set the rules for the "Times, Places and Manner" of elections, "unless Congress legislates to preempt state choices." ECF No. 55 p. 21. As explained above, that's exactly what Congress has done here.

## IV. ***Purcell* Does Not Compel Dismissal**

The Supreme Court's decision in *Purcell* "reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–881 (2022) (Kavanaugh, J., concurring in grant of applications for stays). But the United States is not asking for any change to how voters may vote, who may vote, where they vote, or who they may vote for. Rather, if (and only if) the election's outcome is ultimately impacted by voter confusion, the requested relief would merely seek to maintain the status quo pending an investigation. FAC ¶¶ 50, 56-57. As such, there is no *Purcell* problem.

## CONCLUSION

For the foregoing reasons, the Court should deny the motions to dismiss.

Dated: October 30, 2026

Respectfully submitted,

/s/ Stanley Woodward
Stanley E. Woodward, Jr.
*Associate Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-9500
Email: Stanley.Woodward@usdoj.gov

MICHAEL J. HEYMAN
United States Attorney

E. BRYAN WILSON
Assistant U.S. Attorney
U.S. Attorney's Office
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
Email: Bryan.Wilson@usdoj.gov

**Certificate of Service**
I hereby certify that on October 30, 2026, a true and correct copy of the foregoing document was served electronically through the CM/ECF system upon all case participants who are registered CM/ECF users.

/s/ E. Bryan Wilson
Office of the U.S. Attorney