Cindy Woods (AK Bar # 2510078)
Eric Glatt (AK Bar # 1511098)
ACLU of Alaska Foundation
P.O. Box 90744
Anchorage, AK 99509
(907) 258-0044
cwoods@acluak.org

Ari Savitzky* (AK Bar # NA21918)
Ming Cheung*
Theresa J. Lee* (AK Bar # NA21922)
Garrett Muscatel*
Sophia Lin Lakin* (AK Bar # NA21593)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
asavitzky@aclu.org

*Attorneys for Intervenors Risé Roy, Jan Jakub Grzeda, League of Women Voters of Alaska, and Common Cause*

**Admitted pro hac vice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

STATE OF ALASKA, *et al.*,

*Defendants*,

RISÉ ROY, *et al.*,

*Defendant-Intervenors*,

ALASKANS FOR MARY, *et al.*,

*Defendant-Intervenors*.

Case No. 3:26-cv-00376-SLG

**REPLY MEMORANDUM OF RISÉ ROY, JAN JAKUB GRZEDA, LEAGUE OF WOMEN VOTERS OF ALAKSA, AND COMMON CAUSE IN SUPPORT OF MOTION TO DISMISS THE UNITED STATES' AMENDED COMPLAINT**

## INTRODUCTION

The United States does not offer even a remotely plausible basis for the extraordinary and unprecedented relief it seeks. It does not explain how any statutory obligation under the National Voter Registration Act (NVRA) is implicated here, or cite any substantive provision of the NVRA, or offer any case adopting its view of the NVRA or of statutory construction principles more generally. If Congress had intended for a few words from the "Findings and Purposes" section of a 1993 voter registration statute to give the federal executive imperial oversight over all matters of election integrity in the States, how are we all only learning about it now? Of course it did not, and that ends this case.

But imagine if the United States were somehow right. Imagine if the federal executive could pluck a few words like "election integrity" from some statutory preamble and, on that basis alone, bend the machinery of state elections to his will, preemptively blocking certification of a U.S. Senate election to protect his preferred candidate from defeat and then subjecting voters to a law-enforcement-led inquest about who they "really" supported. Imagine that world and ask whether it is what the Framers wanted or precisely what they most feared.

The federal courts and the separation of powers exist to ensure that can never happen. The rule of law exists to ensure that can never happen. The Constitution's Elections Clause exists to ensure that can never happen.[1] The Amended Complaint must be immediately and forcefully dismissed.

---

[1] *See* The Federalist No. 60 (Alexander Hamilton) (explaining the role of the Elections Clause in protecting republican government from "tyrants").

## BACKGROUND

On October 30, 2026, the United States Attorney for the District of Alaska, Michael Heyman, held a press conference about this case, touting the motions for a preliminary injunction and expedited discovery his office was about to file.[2] During the press conference, which the Department of Justice posted on social media,[3] Mr. Heyman intimated that law enforcement agents may soon interrogate voters about who they *really* intended to support, rather than allowing their ballots to simply be counted as marked, in order "to make sure your vote counts in a way that you meant and intended it to."[4]

Mr. Heyman also represented that this civil matter is "focused on preserving the ballots," "so Alaska can determine" the winner of the election.[5] He did not explain why Alaska needs any help determining who wins its elections according to its own laws. Nor did he disclose that the relief that is actually requested in the Amended Complaint makes no reference to the preservation of ballots, or that, independent of this case, election officials already have a statutory obligation to preserve all ballots for at least 22 months as a matter of course.[6] Nor did he discuss the relief that the Amended Complaint actually

---

[2] Kaelan Deese (@KaelanDC), X (Oct. 30, 2026), https://x.com/kaelandc/status/2116261717118431713?s=46 [https://perma.cc/K9KW-DV4A].

[3] U.S. Dep't of Just. (@TheJusticeDept), X (Oct. 30, 2026), https://x.com/thejusticedept/status/2116266370522304847?a=1dmlbRrStCAz1_SVbqM&s=46 [https://perma.cc/4VJK-KD9V].

[4] *Id.*

[5] Kaelan Deese (@KaelanDC), *supra* n.2.

[6] 52 U.S.C. § 20701.

does request, which includes an order "enjoin[ing] Defendants from certifying any result that may be impacted by [supposed] voter confusion," which is further defined as certain circumstances in which "Senator Sullivan does not win the election."[7]

## ARGUMENT

The United States in its opposition fails to respond to most of the LWVAK Intervenors' legal arguments. Indeed, this Court could grant a complete dismissal just based on the issues that the United States has forfeited.[8] And the arguments the United States does make only confirm that its claims are utterly without merit.

## I. THE UNITED STATES FAILS TO STATE A CLAIM UNDER THE NVRA.

The United States still has not explained how anything alleged in the pleadings implicates any of the NVRA's substantive provisions, all of which involve voter registration.[9] It does not invoke or rely on any of the NVRA's substantive provisions, even

[7] Am. Compl. ¶¶ 56–57, Dkt. No. 43.

[8] The United States offers literally no response to the arguments (1) that the purposes section of the NVRA is unenforceable, (2) that the unenforceable purposes section of the NVRA cannot support a Supremacy Clause claim, and (3) that the requested relief would unlawfully deprive Alaskan voters of the right to vote, the right to popularly elect a U.S. Senator under the Seventeenth Amendment, and the right to a secret ballot. The failure to respond to these arguments constitutes waiver. *See, e.g.*, *Ashley v. Fed. Express Corp.*, No. 3:21-CV-00068-SLG, 2023 WL 2563145, at *7 (D. Alaska Mar. 17, 2023); *Wells v. Fed. Aviation Admin.*, No. 3:22-CV-00187-JMK, 2023 WL 8446391, at *5 (D. Alaska Sept. 12, 2023).

[9] *See* 52 U.S.C. § 20503 ("National procedures for voter registration for elections for Federal office"); *id.* § 20504 ("Simultaneous application for voter registration and application for motor vehicle driver's license"); *id.* § 20505 ("Mail registration"); *id.* § 20506 ("Voter registration agencies"); *id.* § 20507 ("Requirements with respect to administration of voter registration"); *id.* § 20508 (creating Election Assistance Commission and defining "[c]ontents of mail voter registration form"); *id.* § 20509

as it purports to advance an NVRA claim. In opposing the motion to dismiss, it continues to rely for its NVRA claim solely on phrases from the statute's "Findings and Purposes" section, primarily the statement that one purpose of the statue is "to protect the integrity of the electoral process."[10] It says it is suing Alaska for "neglect[ing] its obligation, codified in the NVRA, to 'protect the integrity of [its] electoral process'"[11] and refuses to elaborate further.

The United States never addresses, let alone counters, the "settled principle of law . . . that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms."[12] It never explains how a mousehole phrase from the prefatory section of a statute dealing solely with voter registration could convey mammoth power to the federal executive over unrelated matters

("Designation of chief State election official" who is responsible for coordinating the state's voter-registration-related responsibilities).

[10] 52 U.S.C. § 20501(b)(3) (cited in Plaintiff's Omnibus Opp. to Mots. to Dismiss (Opp. Br.) at 15, 16, 18, 19, Dkt. No. 67); *see also id.* §§ 20501(a)(1), (2) (cited in Opp. Br. at 12).

[11] Opp. Br. at 15 (quoting 52 U.S.C. § 20501(b)(3)).

[12] *Dist. of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008) (quoting 2A N. Singer, Sutherland on Statutory Construction § 47.04, pp. 146 (rev. 5th ed.1992)); *see also El Comite Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999)). *Cf. Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam) ("[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.").

like ballot access or voter confusion or "election integrity" writ large.[13] It never clarifies how its lawless approach to statutory construction is remotely consistent with federalism principles or the Elections Clause, which gives the federal executive no independent role to regulate elections in the absence of a legislative intervention by Congress.[14]

Briefly, the United States seems to resist the conclusion that the NVRA is a "voter registration law" by pointing to *Gonzalez v. Arizona*, a case discussing the "numerous fraud protections in the NVRA," such as attestation sections on registration forms.[15] But as *Gonzalez* confirms in the very passages the United States cites, the fraud protections in the NVRA protect against fraud *in voter registration*.[16] And in any case, the United States never argues that anything alleged in the Amended Complaint might violate, or even implicate, these NVRA provisions relating to voter registration fraud either—because again, *this case just has nothing to do with voter registration*. The United States' total failure to allege any violation of any of the NVRA's substantive provisions requires dismissal of the NVRA claim.

---

[13] *E.g.*, *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001); *see also Learning Res., Inc. v. Trump*, 607 U.S. 229, 230 (2026).

[14] *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 194 (D.D.C. 2025) ("The Elections Clause provides that Congress—not the President—is the check on States' authority to regulate federal elections."); *see also Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 677 (2026) (citing The Federalist No. 59, 362 (Alexander Hamilton) (C. Rossiter ed. 1961)) (observing the Constitution entrusts power over federal elections in "state legislatures 'primarily' and in Congress 'ultimately.'").

[15] 677 F.3d 383, 403 & n.28 (9th Cir. 2012) (cited in Opp. Br. at 19).

[16] *Id.* (citing NVRA provisions reclassified as 52 U.S.C. §§ 20504, 20505, 20507, 20508, 20511).

Meanwhile, the cases that the United States relies on for its theory are not NVRA cases at all, but constitutional ballot access cases that, consistent with the Elections Clause's default rule, confirm the wide latitude that *state governments* possess to regulate their own elections.

*Bullock v. Carter* addressed an Equal Protection challenge to Texas's onerous candidate filing fees, which made ballot access difficult for minor candidates.[17] The Court upheld the high fees, affirming the state's latitude to impose them in order "to protect the integrity of its political processes from frivolous or fraudulent candidacies."[18] *Lindsay v. Bowen* involved a 27-year old running for President of the United States who claimed a constitutional right to be listed on California's ballot though she was ineligible; relying on *Bullock*, the Ninth Circuit affirmed California's right to exclude ineligible candidates who would "clutter and confuse our electoral ballot."[19] *Timmons v. Twin Cities Area New Party* involved a First Amendment challenge by minor party candidates to Minnesota's anti-fusion laws, which prevented them from appearing on multiple ballot lines for different parties.[20] The Court again gave the state a wide berth to decide how to run its elections, acknowledging that "[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes."[21] *Munro v. Socialist Workers Party*

---

[17] 405 U.S. 134, 136 (1972) (cited in Opp. Br. at 13–17).

[18] *Id*. at 145 (cited in Opp. Br. at 15).

[19] 750 F.3d 1061, 1064 (9th Cir. 2014) (cited in Opp. Br. at 13–14)

[20] 520 U.S. 351, 364 (1997) (cited in Opp. Br. at 14)

[21] *Id*.

addressed a minor party candidate's First Amendment challenge to a Washington State rule that required a candidate to receive at least 1% of the total vote in the primary in order to appear on the general election ballot.[22] The candidate argued that his presence would not confuse voters and that his candidacy was not frivolous, but the Court upheld that state's right to choose its own course and rejected any requirement for the state to "prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions."[23]

What do these cases teach? They do not involve the federal executive reversing state election rules, under the NVRA or any other statute. They do not involve the federal government at all. They involve minor candidates challenging state ballot access regulations on federal constitutional grounds. And their basic teaching, consistent with the design of the Elections Clause itself, is that general power to regulate state election practices, including ballot access questions, rests with *state governments* in the first instance, who possess fairly wide latitude in that regard.

No doubt, if Alaska had excluded Daniel J. Sullivan, Jr., from the ballot, as the United States clearly wishes it had, these cases would support Alaska's right to do so. But Alaska did not do that. So what application can these cases have here?

As with the statutory text of the NVRA, the United States seems not even to read the cases it cites. It grabs snippets from decisions that use the word "integrity" or

---

[22] 479 U.S. 189, 195 (1986) (cited in Opp. Br. at 14).

[23] *Id.*

"frivolous" without even cursory engagement with their context or substance. In this blundering way, it invokes a body of cases affirming the *States'* broad right to regulate their *own* ballot access rules to support a baseless claim that *the federal executive* can countermand state ballot access rules as interpreted by the State Supreme Court based on vague notions of "election integrity." No case and no law supports this breathtaking federal assault on a sovereign state and her People.

The utter lack of a valid NVRA claim here is dispositive, and the Court can dismiss with prejudice on this basis alone. But the Court could also dismiss for failure to plausibly plead that Alaska voters will actually be confused by Daniel J. Sullivan, Jr.'s, candidacy, let alone that the integrity of the election is at stake due to "egregious electoral fraud."[24]

The United States' attempts to articulate how voter confusion could actually affect Alaska's U.S. Senate election are not supported by the pleadings and do not make sense. The United States suggests that voters might "inadvertently vote for Daniel J. Sullivan, [Jr.],"[25] but the United States also pleads that the general election ballot, which contains only four names, distinguishes Senator Sullivan from Daniel J. Sullivan, Jr., by first name, middle initial and suffix, and that the ballot labels Senator Sullivan as the "Incumbent" and (unlike Daniel J. Sullivan, Jr.) a "Registered Republican."[26] The United States never tries to explain why a polity that was able to elect a U.S. Senator by write-in ballot will be

---

[24] Opp. Br. at 12.

[25] Am. Compl. ¶ 36.

[26] *Id.* ¶¶ 34, 35.

confused by a ballot that prints the names of the four candidates for them and expressly identifies which candidate is the incumbent, or pleads any additional facts to support that conclusion.

The United States next suggests that, under Alaska's ranked-choice system, a confused Alaska voter "might not rank Senator Sullivan at all (while thinking they already have), resulting in votes for Daniel J. Sullivan to be transferred to candidate Mary Peltola after Daniel J. Sullivan's all-but-guaranteed elimination in the first or second round of tabulations."[27] But how would a voter who wants to vote for Senator Sullivan in those circumstances have their votes transferred to Peltola? Why would someone who wants the incumbent Sullivan to win and who does not understand the difference between the two Sullivans respond by ranking Peltola, the main challenger to the incumbent Sullivan, above anyone named Sullivan? Again, the United States does not explain.[28] Nor does it address the obvious benefit of ranked-choice voting in this exact scenario, because it allows any voter who might be confused to rank both Sullivans first and second, in which case their vote will transfer to Senator Sullivan in any later tabulations.[29]

This is not to say that cynical efforts to support alleged decoy candidates are a good thing. They are not.[30] But while the United States wants to spend its pages and its resources

---

[27] Opp Br. at 8.

[28] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (requiring pleaded facts to support claim "plausible on its face" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

[29] *See* LWVAK Intervenors' Mot. to Dismiss Am. Compl. at 17–18, Dkt. No. 60.

[30] Nor is it to suggest, one way or another, whether Daniel J. Sullivan, Jr., is "a good-faith actor seeking to serve the people of Alaska," a characterization the United States wrongly

trading haymakers with the DSCC Intervenors over their motives, none of that is relevant to the legal issues before the Court. Along with the complete absence of an NVRA claim, the failure to plausibly plead any facts supporting *actual* voter confusion for the general election, let alone confusion that could "result in a victory for Peltola" "even if a majority of Alaskans wish to vote for Senator Sullivan,"[31] is independently fatal to the Complaint.

## II. THE UNITED STATES FAILS TO STATE A CLAIM UNDER THE SUPREMACY CLAUSE.

The United States's discussion of its Supremacy Clause claim in its opposition brief is cut-and-pasted, virtually unedited, from the Amended Complaint.[32] It does not address any of the arguments or authorities in the LWVAK Intervenors' dismissal motion, does not dispute that the Supremacy Clause is not an independent source of substantive rights, and essentially concedes that the claim rises or falls with the NVRA claim because the NVRA is the only federal law that the Amended Complaint claims (however wrongly) is violated. The Supremacy Clause claim accordingly falls.

## III. THE UNITED STATES'S REQUESTED RELIEF IS UNLAWFUL.

The Court can also dismiss because the remedies requested in the Amended Complaint are wholly unlawful.[33] The United States' opposition utterly fails to address the LWVAK Intervenors' arguments that enjoining certification of the ongoing election

---

attributes to the LWVAK Intervenors and that the LWVAK Intervenors never advanced. Opp. Br. at 12.

[31] Am. Compl. ¶ 37.

[32] *Compare* Opp. Br. at 18 *with* Am. Compl. ¶¶ 52–55.

[33] *See* LWVAK Intervenors' Mot. to Dismiss Am. Compl. at 22–25.

would deprive Alaska voters of their fundamental right to vote and would violate the guarantee of the Seventeenth Amendment. It argues that the only "immediate" relief it seeks, for now, is "the preservation and segregation of relevant ballots."[34] But the scope of the interim relief that the United States is seeking has no bearing on Defendants' motions to dismiss: When "determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."[35] If the ultimate relief sought is unlawful, the pleadings must be dismissed.

Chillingly, the United States also does not deny that the relief it seeks here would eviscerate voters' constitutional right to a secret ballot. Indeed, U.S. Attorney Heyman's public remarks heedlessly invoked the specter of armed agents demanding that voters disclose the identity of their preferred candidate before their ballot will be counted.[36] And these interrogations would take place against the backdrop of the President of the United

---

[34] *Id*. at 19.

[35] *Cranford v. City & Borough of Sitka*, No. 1:25-CV-00010-SLG, 2026 WL 1162869, at *2 & n.17 (D. Alaska Apr. 29, 2026) (citing *Schneider v. Cal. Dep't. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998))); *see also U.S. ex rel. Cohen v. City of Palmer*, No. 3:11-CV-00199-SLG, 2013 WL 4510772, at *10 & n.89 (D. Alaska Aug. 26, 2013).

[36] *See* U.S. Dep't of Just. (@TheJusticeDept), *supra* n.3 ("Federal and state law enforcement, including both the Alaska State Troopers on my right and the FBI on my left, are working to make sure that your vote counts in a way that you meant and intended it to count."). The Court can—and should—take judicial notice of this publicly made and posted statement from a government official pursuant to Federal Rule of Evidence 201(b)(2). *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (finding it "appropriate to take judicial notice of . . . information, . . . made publicly available by government entities"); *see also Nguyen v. Scott*, 796 F. Supp. 3d 703, 733 (W.D. Wash. 2025) (holding "public statements made by government officials (to the press or on social media) can be noticed").

States already having ordered the filing of this lawsuit for the purpose of electing his preferred candidate.[37] Pursuing "election integrity" by sending armed government agents to question voters about how they chose to mark their ballots would be Orwellian and, indeed, illegal. Congress has forbidden such interference with voting many times over.[38]

Finally, this entire election-eve lawsuit is barred by *Purcell*. The United States argues that it "is not asking for any change to how voters may vote, who may vote, where they vote, or who they may vote for,"[39] but that is simply untrue. It asks to prevent ballots from being finally counted and the election from being certified until voters can be investigated to the satisfaction of state troopers and FBI agents. Adding a draconian, voter-by-voter exit interview to the voting process would undoubtedly change "how voters may vote," including by contravening Alaska law's guarantee of a secret ballot. Moreover, the stated goal of this enterprise is to *change* "who [voters] may vote for," by changing supposed errant votes from one Sullivan to another. *Purcell* is often described as a safeguard for the States' primary role in regulating their own elections.[40] Few things could intrude on a state's ability to administer its own elections more than forbidding the state from certifying its elections while a sprawling, federal-court-ordered inquisition into voters' choices runs its indefinite course.

---

[37] *See* LWVAK Intervenors' Mot. to Dismiss Am. Compl. at 25–26.

[38] *E.g.*, 18 U.S.C. §§ 592, 594, 595; 52 U.S.C. § 10307(a), (b).

[39] Opp. Br. at 20.

[40] *Id*.

Another one of the major concerns animating *Purcell* is the risk of causing "electoral chaos."[41] Here, the United States wants to halt certification pending unspecified investigations of indeterminate scope and duration. What questions will investigators be allowed to ask? What happens to a ballot cast for Daniel J. Sullivan, Jr., if a voter is unavailable or refuses to answer law enforcement inquiries? How will state troopers and FBI agents, who are not election administrators, apply uniform standards to every voter as required by law?[42] What will be the processes in place to ensure that voter intimidation or unlawful interference does not occur during questioning?[43] Who will be allowed to be present during questioning? What record will be created of the voter's supposed true preference? Who ultimately determines which candidate the voter "meant" to vote for and if and how that ballot should be tabulated?[44] Is there a process for appealing that determination? How much time will be given to the FBI to conduct these investigations? The United States' harebrained scheme would lead to an unprecedented, administratively infeasible process that would deal a crushing blow to election integrity and electoral democracy in Alaska. Even if there were grounds for doing so, *Purcell* forecloses the Court

---

[41] *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026).

[42] 52 U.S.C. § 10101(a)(2)(A) (requiring uniform treatment of voters); *Bush v. Gore*, 531 U.S. 98, 109 (2000) ("When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.").

[43] *E.g.*, 18 U.S.C. §§ 594, 595; 52 U.S.C. § 10307(a), (b).

[44] *See* 52 U.S.C. § 10307(a) (prohibiting the non-tabulation of ballots cast by eligible voters).

from swooping in with voting already underway, undoing a state court's months-ago determination of its own law, and then ordering a roving, illegal inquest into voters' ostensible true desires.

## IV. THE UNITED STATES' CONTINUED PURSUIT OF FRIVOLOUS LITIGATION CONFIRMS SANCTIONS ARE WARRANTED.

The United States does not substantively address LWVAK Intervenors' suggestion that this Court consider sanctions.[45] It attempts to distract from its lawyers' own sanctionable conduct by pointing to alleged "misrepresentations to the Court" by a different, partisan group of intervenors.[46] But on the actual question at hand, there are strong grounds for counsel for the United States to be sanctioned.

Counsel may be sanctioned for filing frivolous "claims, defenses, and other legal contentions" or "multipl[ying] the proceedings . . . unreasonably and vexatiously."[47] Indeed, the Ninth Circuit has affirmed the sanctioning of attorneys for filing a baseless lawsuit supposedly aimed at protecting election integrity.[48]

The United States' reliance on the NVRA is frivolous.[49] Nothing in the text of the NVRA's substantive provisions can conceivably be construed to apply to candidate qualification or election certification or to authorize investigations into the voter intent

---

[45] *See* Opp. Br. at 19 n.6.

[46] *Id*.

[47] *Lake v. Gates*, 130 F.4th 1064, 1070 (9th Cir. 2025), *cert. denied sub nom. Parker v. Gates*, No. 25-882, 2026 WL 3053354 (U.S. Oct. 13, 2026) (quoting Fed. R. Civ. P. 11(b) and 28 U.S.C. § 1927).

[48] *Id*. at 1066–67.

[49] *Supra* Part I; *see* Fed. R. Civ. P. 11(b).

behind the ballots they have cast. Nor can counsel point to any case that supports treating the preamble or purposes section of a statute as a substantive provision to be enforced. Yet after being confronted with those and other obvious, fatal legal defects, counsel for the United States amended their complaint and *doubled down*, adding an equally frivolous Supremacy Clause claim that just repackages the same specious NVRA theory.[50]

The United States' litigation conduct is also indicative of abuse of the legal process. By amending the Complaint, the United States mooted existing motions to dismiss, forcing Defendants to refile the motions and to seek a new expedited schedule and thus delaying resolution of this matter in the days before the election. Worse, despite having no response to the legal arguments raised in the pending motions to dismiss, counsel for the United States waited a full week after commencing the action to then move for a preliminary injunction—which is of course predicated on the United States' ability to demonstrate a likelihood of success on the merits—and for expedited discovery seeking information wholly unrelated to voter registration and any conceivable NVRA violation.[51] It then moved to expedite consideration of these baseless and irrelevant motions.[52]

No matter how badly a lawyer wants a hook for a press conference, or a cudgel for their political rival, or publicity for their client's message, they may not initiate or advance litigation in federal court without a colorable legal basis. As the Ninth Circuit held in *Lake*, "[b]ad faith is present when an attorney knowingly or recklessly raises a frivolous

[50] *See* Am. Compl. ¶ 54.

[51] *See* Dkt. Nos. 69-1, 69-2, 69-3, 69-4.

[52] *See* U.S. Mot. to Expedite, Dkt. No. 70.

argument."[53] By repeatedly filing pleadings and motions lacking any legal basis, even after being confronted with uncontested, fatal flaws in their legal theory, counsel for the United States has continued to "unreasonably and vexatiously" multiply the complexity of this case.[54] The Court should consider ordering counsel "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct" as well as any and all other appropriate sanctions for the United States's legally frivolous attack on Alaska voters.[55]

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

DATED: October 31, 2026

Respectfully submitted,

/s/ Ari J. Savitzky

Eric Glatt (AK Bar # 1511098)
Cindy Woods (AK Bar # 2510078)
ACLU of Alaska Foundation
P.O. Box 90744
Anchorage, AK 99509
(907) 258-0044
cwoods@acluak.org
eglatt@acluak.org

Ari Savitzky* (AK Bar # NA21918)
Ming Cheung*
Theresa J. Lee* (AK Bar # NA21922)
Garrett Muscatel*
Sophia Lin Lakin* (AK Bar # NA21593)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
asavitzky@aclu.org
mcheung@aclu.org
tlee@aclu.org
garrettmuscatel@aclu.org

---

[53] 130 F.4th at 1070 (quoting *Blixseth v. Yellowstone Mountain Club, LLC*, 796 F.3d 1004, 1007 (9th Cir. 2015)) ("The district court found that Lead Attorneys brought the motion for preliminary injunction in bad faith based on the motion's timing and its frivolous nature.").

[54] 28 U.S.C. § 1927.

[55] *Id.*

slakin@aclu.org

**Admitted pro hac vice*

*Attorneys for Intervenors Risé Roy, Jan Jakub Grzeda, League of Women Voters of Alaska, and Common Cause*

## WORD COUNT CERTIFICATION

I hereby certify that the foregoing document, exclusive of caption and signatures, contains less than 5,700 words typed in Times New Roman, 13-point font, consistent with Local Rule 7.4(a)(1).

*/s/ Ari J. Savitzky*
Ari Savitzky
American Civil Liberties Union Foundation