RACHEL WITTY
CIVIL DIVISION DIRECTOR

Margaret Paton Walsh
Laura Fox
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6612
Facsimile: (907) 269-3697
Email: margaret.paton-walsh@alaska.gov
laura.fox@alaska.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>State of Alaska; Carol Beecher, in her official capacity as Director of the Division of Elections of the State of Alaska; the Election Boards of the State of Alaska; and the State Ballot Counting Review Board of the State of Alaska,<br><br>Defendants. | ) | Case No. 3:26-cv-00376-SLG<br><br>**DEFENDANTS' REPLY ON MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

The United States' opposition provides no reason for this Court to entertain this meritless lawsuit any longer. The National Voter Registration Act (NVRA) claim has no legal basis, and the Supremacy Clause claim sinks along with it because it is tethered to the same nonexistent federal-law anchor. What's more, the relief demanded is inappropriate and not even possible given Alaskan voters' vital right to ballot secrecy.

The issues raised in the amended complaint are matters of state law administered by state officials. State law—as definitively interpreted by the Alaska Supreme Court—put Daniel J. on the ballot months ago. And state officials carefully designed the ballot to minimize voter confusion. The Court should immediately dismiss this lawsuit with prejudice and allow state officials to conduct the general election—including ballot counting and certification—free from unwarranted federal interference.

## ARGUMENT

### I. The United States fails to state a claim.

The Court should dismiss the amended complaint with prejudice under Federal Civil Rule 12(b)(6) because it fails to state a claim for relief.

#### A. The National Voter Registration Act does not apply.

The United States' defense of its NVRA claim barely even discusses the NVRA.[1] Again, the NVRA is a voter registration law that imposes no obligations relevant here.[2]

The United States resists characterizing the NVRA as just a "voter registration law," suggesting that "voter fraud" was another one of Congress's concerns in passing it.[3] But it cites only a case about fraudulent *voter registration* to make this point.[4] The amended complaint says nothing about voter registration, fraudulent or otherwise.

---

1 Dkt. 67 at 12–17.

2 Dkt. 55 at 9–12.

3 Dkt. 67 at 19.

4 *See id.* (citing *Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)).

The United States does not cite a single case (or even a law review article) adopting anything close to its current interpretation of the NVRA.[5] Nor does the United States respond to the authority establishing that Congress's declarations of purposes and policy are not substantive.[6] Nor does the United States explain why Congress would have limited the claimed federal power to only states that require advance voter registration.[7] Nor does the United States address the major questions doctrine[8] or explain how its federal-authority elephant could possibly fit into its NVRA mousehole.[9]

The United States' silence on all these points effectively concedes that nothing in (or about) the NVRA supports its construction of the NVRA.

**B. The cited cases only confirm state authority.**

The United States cannot rescue its NVRA claim by stringing together quotes from irrelevant cases rather than discussing the NVRA.[10] None of these cases are about the NVRA. The NVRA does not silently "codif[y]" a caselaw-created federal obligation for states to bar frivolous candidacies.[11] The cited cases concern states *choosing* to restrict how candidates reach the ballot, not federal courts *requiring* states to do so. These

---

5 Dkt. 67 at 12–17.

6 Dkt. 55 at 11; Dkt. 57 at 12–13; Dkt. 60 at 14.

7 Dkt. 55 at 12.

8 Dkt. 55 at 13; Dkt. 57 at 15.

9 Dkt. 55 at 9; Dkt. 57 at 15; Dkt. 60 at 16.

10 Dkt. 67 at 13–17.

11 Dkt. 67 at 15.

cases only confirm that states have broad authority to administer elections, including by regulating ballot access. This is a state power, not a federally enforced state duty.

The only murmur about "duty" comes from a sentence of dicta in *Bullock v. Carter*[12]: "a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies."[13] This dictum does not create a free-floating federal law duty for states to exclude frivolous candidates. *Bullock*'s actual holding did the *opposite* of requiring a state to exclude candidates—it required a state to *allow* more candidates by striking down Texas's unduly high filing fees.[14]

*Anderson v. Celebrezze* likewise did the opposite of requiring a state to exclude candidates: it held that Ohio could not exclude an independent candidate for failure to meet a much earlier filing deadline than required for political party nominees.[15]

As for the other three cited cases, each held that a state *could* impose ballot-access restrictions without violating candidates' rights, not that federal law required the states to do so. *Lindsay v. Bowen* held only that a state *could* keep an unqualified underage candidate off its ballot.[16] It did not hold that federal law required the state to bar such candidates. *Timmons v. Twin Cities Area New Party* held only that a state *could* bar a candidate from running as a "fusion" candidate (meaning the nominee of more than one

---

12 405 U.S. 134, 145 (1972).

13 *Id.*

14 *Id.* at 149.

15 460 U.S. 780, 786 (1983).

16 750 F.3d 1061, 1064 (9th Cir. 2014).

party).[17] It did not hold that federal law required the state to bar such candidacies.[18] *Munro v. Socialist Workers Party* held only that a state *could* require a minor-party candidate to win at least one percent of the primary vote to qualify for the general election ballot.[19] It did not hold that federal law required the state to have this rule.[20]

Just as critically, even if these cases *did* require barring candidates from the ballot, it's too late to do that here. These cases were all about states' power to regulate—on the front end—how candidates reach the ballot. None was about post-election counting procedures or certification of a result. None said anything that could support post-election attempts to unravel a frivolous candidate's participation by discarding voters' votes or reassigning them differently than marked. Such actions are much more likely to *violate* federal law (namely, voters' constitutional rights)[21] than to be required by it.

Perhaps "frivolous" candidacies are something that Congress could address with a federal statute, but it has not done so. The problem would not stop at Daniel J. The ballot also includes Eric Hafner as a candidate for U.S. House even though he is "incarcerated

---

17 520 U.S. 351, 370 (1997).

18 In fact, the Court noted the possibility that pro-fusion arguments could "carry the day in some States' legislatures." *Id.*

19 479 U.S. 189, 199 (1986).

20 In fact, the Court noted that "First Amendment values" can be "threatened by overly burdensome ballot access restrictions." *Id.*

21 *See e.g.*, *United States v. Saylor*, 322 U.S. 385, 387 (1944) (citing *United States v. Mosley*, 238 U.S. 383 (1915) for the proposition that federal law "protected personal rights of a citizen including the right to cast his ballot, and . . . that to refuse to count and return the vote as cast was as much an infringement of that personal right as to exclude the voter from the polling place").

in federal prison in New York" and "not scheduled for release until 2036."[22] Countless similarly questionable candidacies surely exist throughout the country in every election.

The United States' caselaw does not bolster its reading of the NVRA.

### C. The Supremacy Clause adds nothing.

The Supremacy Clause does not help transform the NVRA's "purposes" section into something it is not. The United States concedes (appropriately)[23] that its obstacle preemption theory relies on "the same reasons" as its NVRA claim.[24] It likewise fails for the same reasons. In other words, because the NVRA does not apply to this situation, the Division's administration of the election is not "thwart[ing] 'the accomplishment and execution' of federal law" or "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[25] Congress simply has not addressed the situation presented by this case. There is no preemption here.

---

22 *See Alaska Democratic Party v. Beecher*, 572 P.3d 556, 559 (Alaska 2025) (discussing Mr. Hafner's 2024 candidacy, which he reprised this year); Alaska Division of Elections, *Election Candidates*, https://www.elections.alaska.gov/election-candidates/ (last accessed Oct. 30, 2026) (listing Mr. Hafner as a current candidate).

23 The Supremacy Clause creates no independent cause of action. *See e.g.*, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324–25 (2015) ("[T]he Supremacy Clause is not the 'source of any federal rights,' . . . and certainly does not create a cause of action.") (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)).

24 Dkt. 67 at 17.

25 Dkt. 67 at 18.

### D. The Elections Clause scuttles the NVRA theory.

Congress's power over elections supersedes state law only "so far as it is exercised, and no farther."[26] Here, Congress has not exercised its power. Even if it had, courts "are bound to presume that Congress has done so in a judicious manner [and] that it has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations."[27] The United States' NVRA reading does the opposite.

The United States claims that it is "not seeking to alter the time, place, or manner of Alaska's election,"[28] but it clearly is. These "comprehensive words" in the Elections Clause "embrace authority to provide a complete code for congressional elections, not only as to times and places," but also "in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."[29] The United States' requested intervention into Alaska's vote-counting and certification process would indeed "alter the time, place, or manner of Alaska's election."[30]

To paraphrase and analogize the Ninth Circuit decision issued yesterday about California, "[b]ecause Congress has not exercised the specific power granted to it under

---

26 *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026) (quoting *Ex parte Siebold*, 100 U.S. 371, 386 (1879)).

27 *United States v. California*, No. 26-7231, Dkt. 46.1 at 10 (9th Cir. Oct. 30, 2026) (citing *Siebold*, 100 U.S. at 393).

28 Dkt. 67 at 20.

29 *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

30 Dkt. 67 at 20.

the Elections Clause to override" Alaska's "established laws" governing how candidates qualify for the ballot or when and how election results should be certified, "the State Legislature's statutory scheme remains the only method to do so."[31] Thus, "[a]llowing the United States to misuse" the NVRA "to prescribe how Defendants must process ballots would 'override the plain and manifest dictates of the Constitution itself.'"[32] This Court, like the Ninth Circuit, should "decline the United States's invitation to contravene the Elections Clause by undermining the Constitution's plain text."[33]

Neither count of the amended complaint supplies a cognizable legal theory.

**E. The factual allegations add nothing.**

Not every wrong can be righted in federal court. Because the amended complaint lacks a cognizable legal theory, its factual allegations are beside the point. A political scandal does not support a federal claim without a viable federal law basis. Federal courts do "not entertain post-election contests about garden-variety issues of vote counting and misconduct that may properly be filed in state courts."[34] And even setting the legal deficiency aside, the United States' factual allegations do not identify any failure by the Division or any reason to question the integrity of Alaska's election process.

---

31 *United States v. California*, No. 26-7231, Dkt. 46.1 at 13.

32 *Id*. (quoting *Siebold*, 100 U.S. at 392).

33 *Id*. at 14.

34 *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020).

The Division is not defending either Daniel J. or the Peltola campaign, nor is it "[t]urning a blind eye."[35] Nowhere does the Division "characterize [Daniel J.] as a good-faith actor seeking to serve the people of Alaska."[36] The Division suspected Daniel J.'s motives from the start and wanted to keep him off the ballot.[37] But Alaska law, as definitively interpreted by the Alaska Supreme Court, did not allow that. The United States sat out the state court litigation about Daniel J. that concluded months ago, so it should not be permitted to invoke Daniel J. to derail the election at the last minute.

The Division's compliance with state law does not undermine the integrity of the election or justify this belated federal intervention. The amended complaint does not allege anything the Division has done to cause voter confusion or anything else the Division should be doing to prevent it. Nor does the United States respond to the points the Division has made about the safeguards in place to limit voter confusion: the ballot design distinguishing the candidates in five ways, voters' option to research candidates or request assistance, and voters' freedom to rank both Sullivans if uncertain.[38] The United States' concern that an outcome-affecting number of voters will nonetheless mistakenly rank only Daniel J. instead of Dan S. is speculative and hypothetical. It is thus inadequate to support even a valid cause of action, much less the meritless ones presented here.

---

35 Dkt. 67 at 18.

36 Dkt. 67 at 12.

37 Dkt. 43 at 7–9.

38 Dkt. 55 at 15.

The Court should dismiss the amended complaint under Rule 12(b)(6).

## II. The United States lacks standing.

The United States offers two theories of injury to support its claim to standing.[39] Neither passes muster. But even if the Court credits one, the United States doesn't contest causation and redressability, simply asserting (without any elaboration) that those parts of the test are met.[40] This is not enough to establish standing.

Regarding injury, the Division does not "confuse[s] standing with the merits"[41] because as the Division explained,[42] a federal claim that "clearly appears to be immaterial" or "is wholly insubstantial and frivolous"[43] cannot support jurisdiction. The United States does not address this precedent or explain why its claims—which rest on a patently untenable reading of the NVRA—clear this bar.

Nor does *Bost v. Illinois State Board of Elections*[44] support the United States' limitless assertion of standing to sue over any federal election concern. That case was about whether *candidates* have standing to challenge state rules governing absentee ballot counting. If the United States were itself injured by any allegedly confusing ballot design

---

39 Dkt. 67 at 10–11.

40 Dkt. 67 at 11–12.

41 Dkt. 67 at 11.

42 Dkt. 55 at 18.

43 *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998).

44 *Bost v. Illinois State Board of Elections*, 607 U.S. 71, 77 (2026).

or other procedure, one might expect at least one case in which the United States had successfully asserted a comparable claim against a state. The United States cites none.

But regardless of injury, the United States still lacks standing because it has not shown causation or redressability.

The United States does not explain how the Division's conduct has caused the asserted injury.[45] The facts alleged in the amended complaint demonstrate the opposite by focusing almost entirely on the conduct of others rather than the Division. If the "injury" is possible voter confusion, the Division has done nothing to cause that.

The Court cannot provide any meaningful or proper redress either. An order directing the Division to preserve ballots would be meaningless because the Division already preserves federal election ballots for twenty-two months after the election.[46]

As for "segregating" the ballots that are "potentially tainted" (meaning "all ballots ranking Daniel J. Sullivan"),[47] this unexplained idea makes no sense. If the United States just means physically separating ballots ranking Daniel J. from other ballots, this would accomplish nothing (and could be done just as well after Election Day). No matter how the ballots are physically stored, it will be easy to tell which ballots rank Daniel J.

If the United States means something different—as it seems to—its ballot segregation proposal is both disturbing and impossible. In its motion to expedite its

---

45 Dkt. 67 at 11.

46 6 AAC 25.230.

47 Dkt. 66 at 17; Dkt. 70 at 2.

motion for preliminary injunction, the United States asserted that "preserv[ing] and segregat[ing] all ballots ranking Daniel J. Sullivan . . . *will be impossible after Election Day*,"[48] implying that it envisions some sort of special intervention *on or before* Election Day. The Court cannot order the Division to instruct poll workers to intercept and examine voters' ballots before voters feed them into the voting machines to "segregate" those that rank Daniel J.[49] Nor could this inappropriate intervention be done "only if the result may have been impacted"[50] by Daniel J.'s candidacy, meaning only if it turns out that Mary Peltola prevails by a slim margin (which of course will be unknown until well after the polls close).[51] Tellingly, the United States has not yet filed a proposed preliminary injunction order explaining how this half-baked idea could possibly work.

Regardless of preservation or segregation, the ballots will not reveal any voter's reasons for voting for Daniel J.[52] Examining them will not help "determine what the result would have been absent Daniel J. Sullivan's inclusion on the ballot."[53] The only way to tell if a voter who ranked Daniel J. meant to rank Dan S. instead would be to match the voter with her ballot and ask her, but this is impossible because ballots are not marked with voter names and are commingled to protect ballot secrecy. The secret ballot

---

48 Dkt. 70 at 2 (emphasis added).

49 *See* Alaska Const. art. V, § 3 ("Secrecy of voting shall be preserved.").

50 Dkt. 66 at 17.

51 Dkt. 66 at 17.

52 Dkt. 55 at 20.

53 Dkt. 43 at 20 ¶ 57.

is itself a critical component of the integrity of the electoral process.[54] The United States does not even respond to the Division's and intervenors' serious concerns about this.[55]

The United States thus has not plausibly explained what the Court could possibly order to redress its asserted injury, even if it had some sort of viable claim (which it does not). "Interference with impending elections is extraordinary," and "interference with an election after voting has begun is unprecedented."[56]

The United States' attempt to delay the certification of Alaska's election result not only would not remedy any voter confusion, but it is also barred by Supreme Court precedent instructing that "lower federal courts should ordinarily not alter the election rules on the eve of the election."[57] The United States seeks to distinguish the present case from *Purcell* by claiming that it is "not asking for any changes to how voters may vote, who may vote, where they vote, or who they may vote for."[58] This mischaracterizes the requested relief since any segregation of ballots during voting would inevitably change "how voters may vote," and the United States' vague plans for the fate of ballots "ranking

---

[54] *See e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199 and 207–08 (1992) (recognizing a state's compelling interest in "the integrity of its election process" and upholding a campaign-free zone around the polling place against a First Amendment challenge as "necessary to secure the State's compelling interest" because "[t]he only way to preserve the secrecy of the ballot is to limit access to the area around the voter").

[55] *See* Dkt. 55 at 20; Dkt. 57 at 2, 26–27; Dkt. 60 at 4, 24.

[56] *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

[57] *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v. Perry*, 574 U.S. 951 (2014)).

[58] Dkt. 67 at 20.

Daniel J." also threatens to impact "who voters may vote for"—or, at least, who their votes may count for.[59] The *Purcell* principle thus counsels strongly against the eve-of-election changes the United States requests here.

**CONCLUSION**

For these reasons, the Court should promptly dismiss the amended complaint with prejudice so that Alaska can proceed to administer its elections consistent with state and federal law and without unwarranted interference by the United States.

DATED: October 31, 2026.


RACHEL WITTY
CIVIL DIVISION DIRECTOR

By: /s/ *Margaret Paton Walsh*
Margaret Paton Walsh
Laura Fox
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6612
Facsimile: (907) 269-3697
Email: margaret.paton-walsh@alaska.gov
laura.fox@alaska.gov

**Attorneys for Defendants**


59 *See Election Integrity Project California, Inc, v. Weber*, 113 F.4th 1072, 1086 (9th Cir. 2024) ("The right to vote includes the right to have the ballot counted.") (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

Certificate of Service

I hereby certify that on October 31, 2026, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:26-cv-00376-SLG who are registered CM/ECF users will be served by the CM/ECF system.

*/s/Margaret Paton Walsh*
Margaret Paton Walsh, Chief Assistant Attorney General