DAVID R. WEBER
1535 G STREET
ANCHORAGE, ALASKA 99501
(907) 240-9966

November 17, 2026

Honorable Sharron Gleason
United States District Court Judge
222 W. 7th Avenue, Room 229, Box/Suite #4
Anchorage, AK 99513

Dear Judge Gleason,

This letter will be sent to your "proposed orders" e-mail, hard copy in the U.S. Mail, and by filing with the ECMF. That first and last "filing" is out of the ordinary, I know. However, I felt it was important that the litigants in the recent election interference case be aware of this letter: especially the involved United States Attorneys.

I apologize if this is procedurally improper. I am unaware of how the retired Judges intervened after the fact in Florida. My intervention has been denied. I do not seek reconsideration of that denial. I write, not as a litigant, not as a candidate, and not as a voter. I write as a citizen of this State and Country and as a member of the Federal and the Alaska Bar.

On October 22, 2026 the resources of this Court were hijacked. In the face of U.S. Const., Art. I, sec. 3, cl. 3 [qualifications for Senators, pointedly lacking purity of heart or intention], U.S. Const. Art. I, sec. 4, cl. 1 [Assigning the conduct of elections to the States], U.S. Const. Amend. X [reserving undelegated rights to the States], Powell v. McCormack, 395 U. S. 486 (1969) [U.S. House of Representatives cannot alter the Constitutional qualifications for being a Representative]. US Term Limits, Inc. v. Thornton, 514 US 779, 783 (1995) [Allowing individual States to adopt their own qualifications for congressional service (e.g. purity of heart and intention) would be inconsistent with the Framers' vision of a uniform National Legislature representing the people of the United States. If the qualifications set forth in the text of the Constitution are to be changed, that text must be amended.], and the singularly glaring fact that the law allegedly relied upon has nothing to do with the qualifications of candidates for federal office, much less policing the same,[1] the United States Attorney's Office, reportedly at

[1] The failure to update the entirety of the U.S. Attorney's Justice Manual provisions concerning the "basis" for this lawsuit is telling. Justice Manual § 8-2.274 - Voting Section—National Voter Registration Act, states, *in toto*:

the explicit behest of the Executive filed suit in this Court seeking to usurp and derail Alaska's electoral process and choose Alaska's next United States Senator.

As Professor Hasan summarized the suit:

> "[T]he legal argument is one of the worst I have ever seen." "[C]ompletely meritless." "[S]craping the bottom of the barrel," a "desperation play" that has "zero basis in the law." "[O]ne of the weakest lawsuits I've ever seen." "[U]niquely embarrassing, likely filed only because Trump himself insisted on it." "[U]nconstitutional and unprecedented." Leading election law experts from across the political spectrum have uniformly derided this lawsuit filed by the United States. The error-filled complaint seeks to derail Alaska's normal and constitutionally protected processes for certifying election results, and it includes the preposterous argument that the preamble to a federal voter registration statute mentioning "integrity" grants the federal government vast powers to interfere with state election certification processes (and who knows what else).

[ Docket 48-1, pages 2 and 3, internal footnote citations omitted.] You and I have seen more cogent pleadings emanate from the Cook Inlet Pretrial Facility.[2]

Without even the burden of a filing fee, the resources of this Court were used to try and tilt an election by besmirching an unflavored candidate while seeking to elevate

---

The Voting Section enforces the National Voter Registration Act of 1993, 52 U.S.C. §§20501 to 20511, which established certain required voter registration procedures for elections for federal office. The National Voter Registration Act provides for voter registration to be available in connection with drivers' license applications, provides for mail-in voter registration, and provides that states must designate certain agencies such as public assistance and disability services offices as voter registration agencies. The National Voter Registration Act contains requirements with respect to administration of voter registration by states, including requiring states to implement procedures to maintain accurate and current voting rolls. The National Voter Registration Act regulates the removal of voters from the voting rolls due to change of residence by providing procedural safeguards and prohibits removals based solely on failure to vote. The National Voter Registration Act requires United States Attorney's Offices to share written notice of federal felony criminal convictions to state election officials.

When a United States Attorney's Office receives a complaint or other information regarding the possibility of a National Voter Registration Act violation, that office should forward the complaint or other information to the Voting Section as soon as practicable. The Assistant Attorney General for the Civil Rights Division retains final authority to determine whether a civil rights investigation should be opened; a complaint should be filed; or, in most instances (*see* JM 8-2.100 and 28 C.F.R. §§ 0.160 to 0.164), a case should be settled, and on what terms. The Assistant Attorney General for the Civil Rights Division may delegate this authority to subordinate Civil Rights Division officials and United States Attorneys, where appropriate. The United States Attorney's Office and the Voting Section may work together, as appropriate, on these investigations and any resulting litigation. Division of responsibilities is determined on a case-by-case basis.

[2] If the Court really thinks it requires greater analysis of the glaring meritlessness of this suit, in addition to this Court's decision to dismiss, I would cite the various (twice filed) motions to dismiss of the Defendant and Intervenors.

another. The effort secured literally millions of dollars of free negative campaign publicity. It used the Court, taxpayer funds,[3] and media funds to operate a negative campaign against a political foe. But most importantly for the purposes of this letter, it used the Bar Licenses of Assistant U.S. Attorney Edward Bryan Wilson, U.S. Attorney Michael Heyman and Associate U.S. Attorney General Stanley E. Woodward, Jr.

This Court is urged to take two courses of action. The Court may, under FRCP 11(c)(3), initiate action.

> On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

FRCP 11(b)(1) prohibits the filing of any paper for "any improper purpose". Further, by putting their names on the pleadings, the above named lawyers certified that their "claims, [...] and other legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" FRCP 11(b)(2). This case has neither been voluntarily dismissed nor settled: monetary sanctions are available. They should be substantial, reflecting the calculated abuse of this Court for improper political purpose and free publicity worth millions.

Secondly, these three lawyers, Assistant U.S. Attorney Edward Bryan Wilson (Florida), U.S. Attorney Michael Heyman (California and Alaska), and Associate U.S. Attorney General Stanley E. Woodward, Jr. (D.C.) should all be referred to their respective Bars. In addition, as their conduct occurred in Alaska, it would be appropriate to refer them all to the Alaska Bar. Alaska Rules of Professional Conduct 8.5(a) ("Rule"). While I only cite the Alaska Rules, I rather suspect the other Bars are governed by similar principles.

Pursuant to Rule 1.2(d) the above named attorneys have assisted in the misappropriation of Federal monies in the form of their time, their staffs' time and this Court's time, and all without (with the possible exception of Mr. Wilson) having conversation concerning lawlessness required by Rule 1.2(e). ["There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity."]

Pursuant to Rule 1.16(a)(1)(A), the above named attorneys legal representation in this matter required the violation of the Rules of Professional Conduct (and the Hatch Act) and mandated withdrawal. Certainly, after having seen the various responses of Defendants and Intervenors, a reassessment and withdrawal was required Rule 1.16(a)(4). "A lawyer ordinarily must decline or withdraw from representation if the client demands

[3] The Hatch Act, 5 U.S.C. § 7321 et. seq. violation is glaring. It is hard to reconcile these Government Lawyers' actions with the admonition that they not "use [their] official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7322(a)(1). The Hatch Act, being enforced by the Executive, the same Executive that directed this partisan use of taxpayer funds, will not be enforced here.

that the lawyer engage in conduct that is illegal or violates the Rules of Professional Conduct or other law." Instead they doubled down.

Rule 3.1 states, in relevant part, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a non-frivolous basis in law and fact for doing so, including a good faith argument for an extension, modification, or reversal of existing law." While "account must be taken of the law's ambiguities and potential for change", the above listed lawyers took a declaration of purpose in a voter registration statute, tried to use it in a situation having nothing to do with voter registration, asked for a remedy created entirely out of whole cloth that would disenfranchise an entire State, all in the face of at least three Constitutional provisions and two United States Supreme Court cases either directly, or much nearer, on point to the contrary. The stated basis was a transparent sham. The real basis was to put the Executive's thumb on the scale of an election using this Court and the created media hype. There can be no good faith argument that an unrelated declaration of purpose can amend the Constitution and overturn Supreme Court decisions.

Rule 3.3 requires a modicum of candor with this Court. In a case where the above named attorneys sought to impose a purity of heart and motive requirement on candidates for the United States Senate, candor required, at the very least, acknowledgement of the Constitutional provisions specifically setting forth the qualifications for that office. U.S. Const. Art. I, Sec. 3, cl. 3. Where these lawyers faulted the State of Alaska for failing to impose such a purity requirement, candor required, at the very least, mentioning that in Thornton the Supreme Court stated that States are not free to expand upon Constitutional requirements for office. Where these lawyers were claiming that Congress (in an unrelated declaration of purpose) implicitly imposed a purity requirement, candor required, at the very least, mentioning that in Powell the Supreme Court determined that the House, at least, was not free to expand upon Constitutional requirements for office. Where the argument boils down to a statutory declaration of purpose altering the qualifications for Senator, candor required, at the very least, mentioning why that alteration did not require a Constitutional Amendment.

> Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party. The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case.

The Court will search the papers filed by these attorneys in vain for any such candor. Instead, the Court got crickets on the controlling law.

Rule 4.4 required these lawyers to respect the rights of Alaska, Alaskan voters, and Daniel J. Sullivan. Instead, they sought to deprive Mr. Sullivan of his right to run for the U.S. Senate, and Alaskan voters of the secrecy of their ballots. Indeed, they sought to entirely disenfranchise Alaska's voters!

Rule 5.1 is implicated herein.[4] However, sufficient to the day is the evil thereof. As for 5.2, these lawyers are by no means junior and whatever assurances of ethical compliance they may have received are hardly "reasonable."

The forgoing amounts to attorney misconduct under Rule 8.4(a) and/or (c). See above. The Court has ample grounds to make the Bar referrals.

The integrity of the Department of Justice has come into question nationwide. These lawyers' actions have, once again, demonstrated why.[5] They have attempted to co-opt this Court into political theater and their "October surprise." Defending the integrity of this Court, if not the Department, demands a firm response.

Sincerely,

David R. Weber

---

[4] As Professor Hasan noted, this effort was part of a much larger attack on voting, and voters, in America. Docket 48-1, at pages 3 and 4. That purpose was improper.

[5] They certainly know better. U.S. Attorney's Manual § 9-85.500 Actions that May Have an Impact on an Election

> Federal prosecutors and agents may never select the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution. *See* § 9-27.260. Any action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General.

Nor is this Mr. Woodward's first and only rodeo. While Roper was willing to cut down all the trees of the law to get at the devil, Mr. Woodward's willingness to say and do anything to achieve his deforestation ends has, perhaps, a less benign motive. U.S. District Court Judge Ana Reyes is exploring the ethical limits of Mr. Woodward.